## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | Adv. Pro. No. 24-50186 (JTD) |
| -against- | |
| RYAN SALAME, | |
| Defendant. | |

## BRIEF IN SUPPORT OF DEBTORS' MOTION FOR A
## PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

**Table of Contents**

**Page**

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ............................................................................................5

    A.    Salame Abused His Senior Positions at the FTX Group for His Personal Gain, Receiving over $90 Million in Transfers of Misappropriated Debtor Assets to Fund His Spending Spree. ...........................................................5

    B.    Salame Pleaded Guilty. .................................................................................6

    C.    Salame Repeatedly Represented That He Was Going to Sell His Properties to Satisfy His $6 Million Forfeiture and $5.6 Million Restitution Obligations. ...................................................................................................8

    D.    Salame Delayed for Eight Months in Providing the Information the Debtors Requested About His Exchange Accounts, His Cryptocurrency Wallets, and His Deposits. .................................................................................9

    E.    Salame and the Debtors Began Negotiating a Settlement That Would Require Salame to Transfer to the Debtors All Assets He Was Not Required to Forfeit or Sell to Satisfy His $6 Million Forfeiture Obligation. ........11

    F.    Salame Was Sentenced to 7.5 Years in Prison. ...........................................13

    G.    Settlement Negotiations Between Salame and the Debtors Continued. ...............13

    H.    Salame Became Bitter and Surreptitiously Squandered the Assets He Had Promised to Transfer to the Debtors in a Settlement. .............................................14

    I.    Salame Provided the September and October 2024 Asset Spreadsheets, which Contained Omissions and Misrepresentations. ...........................................15

    J.    On the Eve of Settlement, the Debtors Learned That Salame Had Squandered Assets and Concealed Others. ...........................................................18

    K.    Salame Sold Properties to His Relatives Without Ever Listing Them for Sale and Sold Other Assets for Less Than Fair Market Value. ...........................20

    L.    Salame's Truist Statements Confirmed His Dissipation of Debtor Assets and the Need for Discovery Regarding Salame's Assets......................................21

    M.    There Is a Serious Risk that Salame Will Dissipate His Remaining Assets Absent an Injunction. .................................................................................23

ARGUMENT ...............................................................................................................24

I.      INJUNCTIVE RELIEF IS AVAILABLE BECAUSE THE COMPLAINT ASSERTS
        CLAIMS UNDER DUFTA, SEEKS THE RETURN OF PROPERTY AS EQUITABLE
        RELIEF, AND ASSERTS EQUITABLE CLAIMS.........................................................24

        A.      The Complaint Asserts Fraudulent Transfer Claims under DUFTA, Which
                Provides an Independent Basis for the Court to Issue Injunctive Relief. .............25

        B.      The Equitable Relief Sought in the Complaint Provides Another
                Independent Basis for the Issuance of Injunctive Relief. ......................................25

        C.      The Equitable Claims of Aiding and Abetting Breaches of Fiduciary Duty
                Asserted in the Complaint Provide Another Independent Basis for the
                Issuance of Injunctive Relief. ...............................................................................27

II.     THE DEBTORS SATISFY THE ELEMENTS FOR A PRELIMINARY INJUNCTION
        TO PROHIBIT SALAME FROM FURTHER DISSIPATING DEBTOR ASSETS........27

        A.      The Debtors Have Demonstrated a Likelihood of Success on the Merits. ...........28

                1.      Salame's Guilty Plea Establishes That He Aided and Abetted the
                        FTX Insiders' Breaches of Fiduciary Duties. ..............................29

                2.      Salame Received Intentional Fraudulent Transfers. .....................31

                3.      Salame Received Constructive Fraudulent Transfers. ..................33

                4.      Salame Received Preferential Transfers. ......................................35

        B.      Absent Injunctive Relief to Prevent Salame from Further Dissipating
                Debtor Assets, the Debtors Will Be Irreparably Harmed. .....................................36

        C.      There Is No Meaningful Harm to Any Other Interested Party. .............................39

        D.      Granting a Preliminary Injunction Serves the Public Interest. .............................39

III.    THE COURT SHOULD GRANT EXPEDITED DISCOVERY INTO THE
        DISSIPATION OF SALAME'S ASSETS. ........................................................................40

CONCLUSION.................................................................................................................................41

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Am. Tissue, Inc.*,
   2006 WL 3498065 (Bankr. D. Del. Dec. 4, 2006)........................................................ *passim*

*Anderson* v. *Comm'r*,
   698 F.3d 160 (3d Cir. 2012)...........................................................................................28, 29

*BAE Sys. Aircraft Controls, Inc.* v. *Eclipse Aviation Corp.*,
   224 F.R.D. 581 (D. Del. 2004) ......................................................................................40

*Better Packages, Inc.* v. *Zheng*,
   2006 WL 1373055 (D.N.J. May 17, 2006)....................................................................40

*In re BYJU's Alpha, Inc.*,
   661 B.R. 109 (Bankr. D. Del. 2024) ............................................................... *passim*

*Byers* v. *Ningning*,
   [2021] UKPC 4 (appeal taken from British Virgin Is.) .............................................29

*Capital Pure Assets, Ltd.* v. *CC Tech. Corp.*,
   2024 WL 4279245 (D. Nev. Sep. 24, 2024) ..............................................................5

*In re Cork*,
   2015 WL 5197454 (Bankr. D. Ariz. Sept. 4, 2015).....................................................5

*Damage Recovery Sys., Inc.* v. *Tucker*,
   2005 WL 388597 (D. Del. Feb. 2, 2005) ...................................................................27

*In re DBSI, Inc.*,
   409 B.R. 720 (Bankr. D. Del. 2009) .........................................................................36

*Del. River Port Auth.* v. *Transam. Trailer Transp., Inc.*,
   501 F.2d 917 (3d Cir. 1974)........................................................................................28

*In re Evangelist*,
   760 F.2d 27 (1st Cir. 1985) .........................................................................................27

*Granfinanciera, S.A.* v. *Nordberg*,
   492 U.S. 33 (1989)................................................................................................24, 26

*Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)........................................................................................... *passim*

*In re Hechinger Inv. Co. of Del.*,
   327 B.R. 537 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ..............27, 32

*Instant Air Freight Co.* v. *C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)............................................................36

*James* v. *Heritage Valley Fed. Credit Union*,
    197 F. App'x 102 (3d Cir. 2006) ...................................................29

*Kone Corp.* v. *Thyssenkrupp USA, Inc.*,
    2011 WL 4478477 (D. Del. Sept. 26, 2011) ..................................40

*Malpiede* v. *Townson*,
    780 A.2d 1075 (Del. 2001) ............................................................29

*In re McDonald's Corp. S'holder Derivative Litig.*,
    289 A.3d 343 (Del. Ch. 2023).......................................................29

*Montana* v. *United States*,
    440 U.S. 147 (1979)...............................................................28, 29

*Notaro* v. *Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) ....................................................40

*Penn Mart Realty Co.* v. *Becker*,
    298 A.2d 349 (Del. Ch. 1972)........................................................29

*In re NewPage Corp.*,
    569 B.R. 593 (D. Del. 2017)..........................................................35

*In re Portnoy*,
    201 B.R. 685 (Bankr. S.D.N.Y. 1996)............................................5

*Rader* v. *ShareBuilder Corp.*,
    772 F. Supp. 2d 599 (D. Del. 2011)................................................5

*Reilly* v. *City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)...........................................................28

*SEC* v. *Chappell*,
    107 F.4th 114 (3d Cir. 2024) ...................................................36, 39

*SEC* v. *Infinity Grp. Co.*,
    212 F.3d 180 (3d Cir. 2000)......................................................36, 39

*In re Team Sys. Int'l*,
    2023 WL 1428572 (Bankr. D. Del. Jan. 31, 2023) ...................*passim*

*Urban Commons Queensway, LLC* v. *EHT Asset Mgmt., LLC*,
    2021 WL 3828556 (Bankr. D. Del. Aug. 27, 2021) .......................28

**Statutes**

11 U.S.C. § 547 ................................................................................................................................35

11 U.S.C. § 548 ...........................................................................................................................32, 33

Del. Code Ann. tit. 6, § 1304 .....................................................................................................32, 33

Del. Code Ann. tit. 6, § 1305 ............................................................................................................33

Del. Code Ann. tit. 6, § 1307 ............................................................................................................25

Fed. R. Civ. P. 26 .............................................................................................................................40

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research LLC ("Alameda LLC"), Alameda Research Ltd. ("Alameda"), North Dimension Inc. ("North Dimension"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (together, the "Debtors" and "Plaintiffs" in the above-captioned adversary proceeding) hereby submit this brief in support of their motion (the "Motion") for a preliminary injunction to enjoin Defendant Ryan Salame from further dissipating assets, or the proceeds thereof, without prior Court approval, and for expedited discovery, including the issuance of Rule 45 subpoenas, regarding the dissipation of Salame's assets. Contemporaneously with filing the Motion, the Debtors filed an Adversary Complaint (the "Complaint") against Salame asserting claims for fraudulent and preferential transfers, aiding and abetting breaches of fiduciary duties, and disallowance of claims, while seeking certain equitable and monetary relief. In support of this Motion, the Debtors rely upon and incorporate the Complaint and the Declaration of Stephanie G. Wheeler (the "Wheeler Declaration").

## **INTRODUCTION**

1.       After negotiating a settlement for more than a year that would have required Ryan Salame ("Salame"), a convicted felon and the former Chief Executive Officer of FTX Digital Markets Ltd. ("FDM"), to transfer to the Debtors all of his assets that he did not forfeit to the Department of Justice ("DOJ") or sell to satisfy the $6 million forfeiture he owed the DOJ, the Debtors were shocked to learn—on the day they were finally to sign the settlement agreement—that Salame had spent more than $6 million that he was supposed to transfer to the Debtors under the settlement agreement. For more than a year, Salame and the Debtors had repeatedly discussed and agreed that Salame would sell his real properties to satisfy the approximately $11.6 million in forfeiture and restitution obligations that Salame owed under his plea agreement and preliminary forfeiture order. And despite assurances that Salame's counsel

would oversee and advise Salame on the sale of his real properties, the Debtors learned at the eleventh hour that Salame had deposited $5.248 million in proceeds from the sales of eleven properties (that he purchased with Debtor funds) into his Truist bank account—rather than escrowing the proceeds—and had spent them all for his own benefit.  For months, Salame concealed from the Debtors the fact that he was spending the proceeds of the property sales, while simultaneously providing the Debtors with spreadsheets that listed the proceeds of those property sales as current assets of his.  In addition to the $5.248 million of property sales, on October 8, 2024, two days before the settlement was to be executed, Salame's counsel informed the Debtors that Salame had "further diminished" the $1.146 million he had reported in his Truist bank account as of October 3, 2024, and that the dissipation was likely to be "substantial." (Wheeler Decl. Ex. 11 at 1.)

2.      The Debtors learned that Salame had spent some of the $5.248 million of sale proceeds to pay more than $850,000 in credit card bills since January 2024 and on "legal fees" for new counsel—including counsel to seek a pardon for him.  It also appears from Salame's Truist statements that Salame may have spent $1 million of the funds on a retainer for criminal lawyers for his then domestic partner, Michelle Bond, who was indicted on campaign finance violations.

3.      In dissipating $6 million in assets that he had committed to transfer to the Debtors as part of the settlement, Salame demonstrated the very same self-interested behavior, greed, and disregard for FTX Group[2] creditors that caused his sentencing judge to chastise him:

> [W]hen it became apparent that FTX was on the brink of bankruptcy and was at least a billion dollars in the hole, you pulled $5 million in cryptocurrency from any account you controlled at FTX into your own

---

[2]      The term "FTX Group" means, collectively, the above-captioned debtors and debtors-in-possession, and all affiliates of them that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

crypto wallet.  You tried to withdraw tens of millions more that day, but the withdrawals failed, the further withdrawals.  And you spent millions from the more than $5 million you *got out just before the collapse came on hiring a public relations firm, paying off personal obligations, and the like.  It was me first, I'm getting in the life boat first, the heck with all those customers.*

(Wheeler Decl. Ex. 7 at 22:8-17 (emphasis added).)

4.      And if dissipating $6 million of Debtor funds was not bad enough, Salame also repeatedly concealed assets from the DOJ and the Debtors and misrepresented that assets were "inaccessible" when they were not.  Salame initially claimed to the DOJ—under penalty of perjury—and to the Debtors that certain cryptocurrency was "inaccessible" until the Debtors caught Salame using that allegedly "inaccessible" cryptocurrency to purchase a meme coin with his own face on it.  After Salame had spent the proceeds of the sale of his real properties that he had originally intended to use to satisfy his $6 million forfeiture obligation to the DOJ, Salame miraculously found $3.48 million in Solana tokens he omitted to disclose to the DOJ under penalty of perjury and promptly used the tokens to help satisfy his forfeiture obligation.  And as the Debtors and Salame were finalizing the settlement agreement for execution, Salame disclosed for the first time that he had overpaid his 2022 taxes by $3 million—an asset he had not previously disclosed on any asset spreadsheet provided to the DOJ or the Debtors.

5.      Given Salame's demonstrated pattern of dissipating and concealing assets, the Debtors respectfully request that the Court enjoin Salame from further dissipating his assets, or the proceeds thereof, without prior Court approval and grant expedited discovery, including the issuance of Rule 45 subpoenas, regarding the dissipation of Salame's assets.

6.      Absent an injunction, there is a serious risk that Salame will dissipate his remaining assets, as he recently did with his Truist account, which declined from $1.146 million to virtually nothing in a matter of days.  An injunction is also necessary to prevent Salame from

squandering the proceeds of the real properties he currently has listed for sale. For example, an asset spreadsheet he provided to the Debtors in October 2024 indicated that his property in Lisbon, Portugal had a pending sale for $700,000. Salame has three other properties that are listed for sale and one that the *New York Times* recently reported would be sold and the proceeds surrendered. The same risk of dissipation is present with respect to his other assets—Salame has cryptocurrency in certain accounts or wallets that he can dissipate, as he did with the $550,000 to $650,000 of Raydium tokens he miraculously found in May and apparently spent, because they do not appear on his October 2024 asset spreadsheet.

7.      A preliminary injunction is available because the Complaint (i) asserts claims under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"), which provides an independent basis for injunctive relief, (ii) seeks equitable remedies, including the return of specific real property, and (iii) asserts equitable claims, including aiding and abetting breaches of fiduciary duties. *See In re BYJU's Alpha, Inc.*, 661 B.R. 109, 118-22 (Bankr. D. Del. 2024) (Dorsey, J.).

8.      Moreover, the Debtors satisfy all of the requirements for a preliminary injunction. First, given that Salame pleaded guilty and collateral estoppel extends to all issues that were necessarily admitted to in his plea, the Debtors have demonstrated a likelihood of success on the merits of their fraudulent transfer, aiding and abetting breaches of fiduciary duties, and preferential transfer claims against Salame. Second, courts routinely find irreparable harm is established where, as here, assets are at risk of dissipation. *See, e.g.*, *In re Team Sys. Int'l, LLC*, 2023 WL 1428572, at *12 (Bankr. D. Del. Jan. 31, 2023) (granting a preliminary injunction where there was "cause for concern that without an injunction, . . . defendants may move or conceal assets"). Third, Salame will not suffer any meaningful harm if an injunction

issues.  Fourth, "[t]he public interest is served when the Court imposes relief [that] . . . protects bankrupt estates from misappropriation of assets."  *Id.* at *13 (quoting *In re Am. Tissue, Inc.*, 2006 WL 3498065, *5 (Bankr. D. Del. Dec. 4, 2006)).

## STATEMENT OF FACTS[3]

A.     **Salame Abused His Senior Positions at the FTX Group for His Personal Gain, Receiving over $90 Million in Transfers of Misappropriated Debtor Assets to Fund His Spending Spree.**

9.     Salame was the CEO and Chairman of FDM, a wholly owned subsidiary of FTX, from September 2021 to November 2022.  He was previously Head of Over-the-Counter Trading at Alameda, FTX, and WRSS.

10.     The Debtors' investigation revealed that, as a senior executive of the FTX Group and the right-hand man of Samuel Bankman-Fried, Salame arranged for FTX customer funds to be deposited into bank accounts of Alameda and its subsidiaries, where they were then commingled with corporate funds and used to make billions of dollars of venture investments and personal investments by Bankman-Fried, Caroline Ellison, Nishad Singh, and Zixiao "Gary" Wang (the "FTX Insiders"); to purchase hundreds of millions of dollars of luxury real estate for the FTX Group and its employees in the Bahamas; to make over $100 million in political contributions; and to make hundreds of millions in transfers to FTX Insiders.  The Debtors' investigation also revealed that Salame was involved in concealing the FTX Insiders' fraud from its outside auditors by suggesting that FTX create a Payment Agent Agreement to conceal the

---

[3]     In support of this Motion, the Debtors rely on settlement communications to show Salame's bad faith, his intent to conceal certain assets from the Debtors, and the likelihood of irreparable harm if the Motion is not granted, which is permissible under Federal Rule of Evidence 408(b).  *See, e.g.*, *In re Portnoy*, 201 B.R. 685, 692 (Bankr. S.D.N.Y. 1996) (allowing use of settlement communications to demonstrate "intent to conceal assets"); *Rader* v. *ShareBuilder Corp.*, 772 F. Supp. 2d 599, 605 (D. Del. 2011), *aff'd sub nom.*, *Rader* v. *ING Groep NV*, 497 F. App'x 171 (3d Cir. 2012) (permitting use of settlement negotiations to show a party was "acting in bad faith"); *Capital Pure Assets, Ltd.* v. *CC Tech. Corp.*, 2024 WL 4279245, at *21 n.10 (D. Nev. Sep. 24, 2024) (permitting "reliance on [settlement communications] to show irreparable injury"); *In re Cork*, 2015 WL 5197454, at *22 (Bankr. D. Ariz. Sept. 4, 2015) (allowing evidence of settlement discussions to show bad faith).

true reason that Alameda received FTX customer funds, and was involved in committing fraud on banks by providing false information and instructing FTX Group employees to provide false information to banks in connection with efforts to open new North Dimension bank accounts that would be used to accept FTX.com customer deposits.  (Compl. ¶ 48.)

11.     Salame also abused his senior position at the FTX Group for his own personal benefit.  For example, the Debtors' investigation revealed that Salame received over $40 million in misappropriated Debtor assets to finance political contributions made in his own name.  (*Id*. ¶¶ 71-73.)  Salame received additional transfers of tens of millions of dollars in misappropriated Debtor assets which he used to purchase real estate, businesses, luxury cars, and make personal investments.  (*Id*. ¶¶ 118-23.)  Salame also arranged for misappropriated Debtor funds to be used to purchase a $15.4 million jet for the use of the FTX Insiders.  (*Id*. ¶¶ 124-27.)

12.     The Debtors' investigation also revealed that on the evening of November 7, 2022, after Salame knew of the FTX Group's collapse, he withdrew $5 million from his FTX.com account.  (*Id*. ¶ 40.)  On the day the FTX Group declared bankruptcy, Salame emptied his FTX.US account of over $600,000.  (*Id*.)

**B.     Salame Pleaded Guilty.**

13.     In August 2023, shortly before Salame entered into a plea agreement with the DOJ, Salame initiated discussions with the Debtors to settle their claims against him. (Wheeler Decl. ¶ 2.)  In an August 3, 2023 meeting, Salame's counsel informed the Debtors that Salame's goal was "to be as cooperative as possible, and do whatever he can within the realm of what's possible to make peace" with the Debtors.  (*Id*.)  Twice in August 2023, the Debtors requested an "accounting" of all Salame's assets, including the assets the DOJ would require Salame to forfeit and any cryptocurrency exchange accounts and cryptocurrency wallets under

his control, to enable the Debtors to evaluate any settlement.  (*Id.* ¶¶ 2-3.)  Salame's counsel informed the Debtors that Salame was preparing such an accounting for the DOJ.  (*Id.* ¶ 2.)

14.     On September 7, 2023, Salame pleaded guilty to (i) conspiracy to make unlawful political contributions, and (ii) conspiracy to operate an unlicensed money transmitting business.  (Wheeler Decl. Ex. 1 at 1.)  Salame's Plea Agreement also required him to forfeit $1,555,186,143 to the United States and to pay $5,593,177.91 in restitution to the Debtors.  (*Id.* at 2-3.)

15.     During his plea allocution, Salame testified that "[b]etween the fall of 2021 and November of 2022 mid-term elections" he had made "tens of millions of dollars in campaign contributions" in his name that were "funded by transfers from the bank accounts of an Alameda subsidiary," despite "kn[owing that] it was prohibited by campaign finance laws to make contributions in [his] name with money that was not [his] own."  (Wheeler Decl. Ex. 2 at 21:18-22:9.)  He further admitted that "[w]hile at the time these funds were categorized in both my own and Alameda's ledgers as loans, I understood then that the loans would eventually be forgiven and I never intended to repay them."  (*Id.* at 21:23-22:1.)

16.     In connection with Salame's guilty plea, the United States District Court for the Southern District of New York (the "<u>SDNY Court</u>") entered a Consent Preliminary Order of Forfeiture as to Substitute Assets/Money Judgment ("<u>Forfeiture Order</u>") that required Salame to pay $1,555,186,143 in forfeiture to the federal government.  (Wheeler Decl. Ex. 3 at 2.)  The Forfeiture Order provided that Salame's obligation to pay $1,555,186,143 in forfeiture would be deemed satisfied if he paid $6 million to the DOJ and forfeited the following substitute assets: (a) 12 Housatonic St., Lenox, MA; (b) 8 Tucker St., Lenox, MA; (c) ownership and equity interest in East Rood Farm Corporation; and (d) a 2021 Porsche 911 Turbo S.  (*Id.* at 2-3.)

17.     In connection with his plea negotiations, Salame provided to the DOJ a spreadsheet listing his assets as of September 7, 2023 ("Salame DOJ Asset Spreadsheet"). (Wheeler Decl. ¶ 9 & Ex. 4.)   The Forfeiture Order provided that Salame "has sworn, under penalty of perjury, that [the Salame DOJ Asset Spreadsheet] is a true and accurate description of his current finances" as of September 7, 2023, and that the DOJ could enforce the entire $1,555,186,143 forfeiture amount "if any information in the [Salame DOJ Asset Spreadsheet]" was "false or incomplete as of September 7, 2023."  (Wheeler Decl. Ex. 3 at 2, 4-5.)

**C.     Salame Repeatedly Represented That He Was Going to Sell His Properties to Satisfy His $6 Million Forfeiture and $5.6 Million Restitution Obligations.**

18.     On September 26, 2023, Salame's counsel sent the Debtors the Salame DOJ Asset Spreadsheet, which he had sworn under penalty of perjury was true and accurate. (Wheeler Decl. ¶ 9 & Ex. 3 at 2.)   During a September 27, 2023 meeting, Salame's counsel informed the Debtors that Salame was planning to sell the real properties he owned in Lenox, Massachusetts by his March 6, 2024 sentencing date to satisfy the $6 million forfeiture he owed, as well as the $5.6 million in restitution that he owed the Debtors, and that Salame would "try[] his best to get full market value for all of [them]."  (Wheeler Decl. ¶ 11.)   During that meeting, the Debtors expressed concerns about Salame selling the real estate himself and sought assurances from Salame's counsel that counsel would be involved in the sale process to ensure that "these are arms-length transactions—that he's not selling to his mother [or] best friend for a below-market price" and not "a fire sale."  (*Id.* ¶ 12.)   Salame's counsel assured the Debtors that Salame was giving them "updates" on the sale process and that Salame's counsel was "advising him" on and had "some insight" into the sales process.  (*Id.*)

19.     In meetings on May 10, May 15, and August 8, 2024, Salame's counsel reiterated that Salame was in the process of selling all of his properties, including those in Lenox

and Texas, to satisfy his $6 million forfeiture and $5.6 million restitution obligations. (*Id.* ¶¶ 25, 32-33, 45.) To try to ease the pressure on Salame to raise the $11.6 million, on January 5, 2024, the Debtors proposed that Salame satisfy the $5.6 million in restitution that he owed to the Debtors by transferring to the Debtors the deed to a luxury Bahamas apartment that Salame owned and had purchased with Debtor funds. (*Id.* ¶ 21.) The Debtors were concerned that Salame might try to sell the Bahamas apartment at a below-market price in order to raise the cash necessary to satisfy his forfeiture and restitution obligations, which would prejudice the Debtors by failing to maximize the value of the property and by creating an unfavorable market comparable for the dozens of other Bahamian residences that the Debtors need to monetize for the estates. (*Id.*) The Bankruptcy Court approved Salame's transfer of the Bahamas apartment to the Debtors to satisfy his $5.6 million restitution obligation [D.I. 15504], which meant that Salame only needed to sell properties sufficient to raise $6 million to satisfy his forfeiture obligation by his sentencing date of May 28, 2024. (Wheeler Decl. ¶¶ 23-24.)

> **D. Salame Delayed for Eight Months in Providing the Information the Debtors Requested About His Exchange Accounts, His Cryptocurrency Wallets, and His Deposits.**

20. During a September 27, 2023 meeting, the Debtors requested that Salame provide more granular detail about the allegedly "inaccessible" cryptocurrency listed on the Salame DOJ Asset Spreadsheet so they could verify that those cryptocurrency assets were, in fact, inaccessible. (Wheeler Decl. ¶ 13.) During that meeting and continuing *over the next eight months*, the Debtors repeatedly requested at least *six different times* a complete list of Salame's exchange accounts, his wallet addresses, and his deposit addresses. (*Id.* ¶¶ 13, 15-16, 19, 27, 37.) Rather than providing the requested information, Salame instead repeatedly stonewalled and rope-a-doped the Debtors. Salame's counsel frequently stated that Salame claimed he needed access to his 1Password account at FTX in order to access his exchange accounts. (*See*

*id.* ¶¶ 13, 15, 19, 37.)  Even after the Debtors informed Salame's counsel that they had examined Salame's 1Password account and it contained no cryptocurrency exchange accounts or passwords for such accounts, Salame continued to claim that the requested information would be in his 1Password account.  (*Id.* ¶¶ 19, 37.)  The Debtors repeatedly suggested that Salame search his personal emails for automated messages he had received from exchanges, which would contain his account numbers and enable him to put together a list of exchange accounts.  (*Id.* ¶¶ 19, 27, 37.)

21.    While Salame dragged his feet in providing the requested information about his exchange accounts, cryptocurrency wallets, and deposit addresses, the Debtors, through their own investigation, identified and raised with Salame's counsel (i) cryptocurrency assets that Salame had not disclosed to the DOJ on the Salame DOJ Asset Spreadsheet and (ii) misstatements concerning cryptocurrency on the Salame DOJ Asset Spreadsheet.  For example, during a November 17, 2023 meeting, the Debtors informed Salame's counsel that they had identified a Solana wallet controlled by Salame that held assets then valued at $800,000.  (*Id.* ¶ 16.)  Salame had not included Solana tokens on the Salame DOJ Asset Spreadsheet.  (*See* Wheeler Decl. Ex. 4.)  As another example, during a May 10, 2024 meeting, the Debtors raised concerns that Salame had recently accessed one of the cryptocurrency wallets that he had listed on the Salame DOJ Asset Spreadsheet (under penalty of perjury) as being "inaccessible" in order to purchase a newly launched commemorative meme coin with the ticker "Ryan" ($RYAN) that featured Salame's face on it.  (Wheeler Decl. ¶ 28.)  In addition, during a May 15, 2024 meeting, Salame's counsel stated that Salame had recently located Raydium tokens worth between $550,000 and $650,000; like the Solana tokens, Salame had failed to include the Raydium tokens on the Salame DOJ Asset Spreadsheet.  (*Id.* ¶ 36 & Ex. 4.)

22.     On June 5, 2024, more than eight months after the Debtors had first requested it on September 27, 2023, Salame finally provided to the Debtors an allegedly complete list of exchange accounts and wallet addresses.  (Wheeler Decl. ¶¶ 13, 40.)

**E.      Salame and the Debtors Began Negotiating a Settlement That Would Require Salame to Transfer to the Debtors All Assets He Was Not Required to Forfeit or Sell to Satisfy His $6 Million Forfeiture Obligation.**

23.     As his May 28, 2024 sentencing date approached, Salame again expressed a desire to reach a settlement with the Debtors.  (Wheeler Decl. ¶¶ 25, 30-31.)  During a May 10, 2024 meeting, the Debtors proposed a settlement whereby Salame would transfer to the Debtors all assets that he was not required to forfeit or sell to satisfy the $6 million forfeiture obligation. (*Id.* ¶ 26.)  This was the same settlement framework that the Debtors had proposed to other FTX Insiders who had pleaded guilty.  (*Id.*)

24.     On May 14, 2024, Salame filed with the SDNY Court his sentencing memorandum, in which he stated that he "is obligated to forfeit a monetary payment in the amount of $6 million, two properties and a business, and to make restitution in the amount of $5,593,177.91 to the FTX Estate, an aggregate amount that, *when combined with what he intends to transfer to the FTX Estate apart from his forfeiture and restitution, will leave him with no remaining assets*."  (Wheeler Decl. Ex. 6 at 29-30 (emphasis added).)

25.     To ensure that they understood Salame's intent correctly, during a May 15, 2024 meeting, the Debtors read to Salame's counsel that quote from his sentencing memorandum and asked counsel to confirm that it was Salame's intention to turn over to the Debtors all assets Salame had left after paying forfeiture and restitution.  (Wheeler Decl. ¶¶ 30-31.)  Salame's counsel confirmed the Debtors' understanding.  (*Id.* ¶ 31.)  Given Salame's representation to the SDNY Court and Salame's counsel's confirmation, the Debtors diligently continued their efforts to obtain information concerning what assets Salame had sold to satisfy

his $6 million forfeiture obligation (the restitution having been satisfied by the transfer of the Bahamas apartment), so that the Debtors could understand what assets would remain and be turned over to them.  (*Id.* ¶¶ 41, 45.)

26.     When the Debtors inquired during the May 15, 2024 meeting what assets Salame intended to use to satisfy the $6 million in forfeiture, Salame's counsel disclosed *for the first time* that Salame planned to transfer to the DOJ Solana tokens that Salame had "inadvertently" failed to include on the Salame DOJ Asset Spreadsheet, but that he had recently discovered—presumably *after the Debtors had informed his counsel of the existence of the Solana tokens during the November 17, 2023 meeting*.  (*Id.* ¶¶ 16, 35).  Salame's counsel stated that because the Solana tokens had increased significantly in value, Salame intended to use them to satisfy "a good part" of the forfeiture obligation.  (*Id.* ¶ 35.)  In addition to the Solana tokens, Salame's counsel indicated that Salame would satisfy the remainder of the forfeiture with *the proceeds of the sales of the Lenox properties and one Texas property*, and the sale of his investment interests in Kraken Ventures Fund LP ("Kraken") and RedBird Capital Partners ("RedBird").  (*Id.* ¶ 32.)

27.     Thus, at the conclusion of the May 15, 2024 meeting, the Debtors felt reassured by Salame's statement in his sentencing memorandum, the confirmation from Salame's counsel that Salame intended to transfer to the Debtors all assets that he did not have to sell to pay his forfeiture, and the statements by Salame's counsel that the proceeds of the sale of the Lenox properties and one Texas property would go to pay the $6 million forfeiture owed to the DOJ, all of which was consistent with what Salame's counsel had been telling the Debtors since the September 27, 2023 meeting.  (*Id.* ¶ 33.)

F.      **Salame Was Sentenced to 7.5 Years In Prison.**

28.      On May 28, 2024, Salame was sentenced to 7.5 years in prison—which exceeded the range the DOJ had requested—and fined $500,000.  (Wheeler Decl. ¶ 38 & Ex. 7 at 17:9-11, 24:5-24.)  Salame's surrender date was set for August 29, 2024, and he received an extension until September 3, 2024 to satisfy his $6 million forfeiture obligation.  (Wheeler Decl. ¶¶ 38-39.)

G.      **Settlement Negotiations Between Salame and the Debtors Continued.**

29.      After Salame's sentencing, on June 7, 2024, the Debtors met with Salame's counsel and again asked for an accounting of what assets Salame had sold, how much he had received in sale proceeds, and where he was in terms of satisfying the $6 million forfeiture.  (Wheeler Decl. ¶ 41.)  Salame's counsel reported that the U.S. Marshals were going to sell Salame's Solana tokens, he had sold the properties in Lenox, he had sold his investment interest in Kraken, and he was awaiting the closing of the sale of his interest in RedBird.  (*Id.*)  When the Debtors asked whether Salame intended to satisfy the $6 million forfeiture obligation with the sale of those assets, Salame's counsel said they could provide a term sheet in a week and a half, after the Solana had been sold, which would enable the Debtors to understand which assets were being used to satisfy the $6 million forfeiture and which assets would be turned over to the Debtors pursuant to a settlement.  (*Id.*)

30.      On July 1, 2024, after three weeks passed without receiving the promised term sheet and with Salame's August 29, 2024 surrender date approaching, the Debtors sent a draft settlement agreement to Salame's counsel that required Salame to "transfer, cause to be transferred or assign to [the Debtors] any and all assets or other interests reflected on [a to-be-provided] July 2024 Asset Statement (or the proceeds thereof) except to the extent that any such assets or other interests have been sold to satisfy" the $6 million forfeiture.  (*Id.* ¶ 43.)

31.     Despite repeated requests for the updated asset spreadsheet throughout August and September 2024, the Debtors did not receive a comprehensive updated asset statement as contemplated by the draft settlement agreement until October 3, 2024. (*Id.* ¶¶ 47, 55.)

**H.     Salame Became Bitter and Surreptitiously Squandered the Assets He Had Promised to Transfer to the Debtors in a Settlement.**

32.     After Salame was sentenced to 7.5 years in prison and was fined $500,000, Salame's counsel informed the Debtors during an August 8, 2024 meeting that Salame was "not in a great frame of mind" given that his sentence was much "harsher" than expected and that he had unexpectedly been fined $500,000.  (Wheeler Decl. ¶ 46.)  Salame's counsel explained that Salame now wanted to keep his $4 million home in Potomac, Maryland, rather than transferring it to the Debtors, because his attitude had shifted:  "[if] I'm giving up the value of everything I own if I settle, and I'd be giving the estate everything I own . . . why wouldn't I think about sticking up for myself a little." (*Id.*)

33.     Salame's attitude soured even further after his then-domestic partner Michelle Bond was indicted on campaign finance charges on August 19, 2024.  (*Id.* ¶ 48.) Thereafter, Salame filed a motion attempting to withdraw his guilty plea on the grounds that he had understood that the DOJ would cease investigating Bond if he pleaded guilty.  (*See* Wheeler Decl. Ex. 8 at 2:15-21.)  Although Salame subsequently attempted to withdraw his motion, the SDNY Court nevertheless required a hearing, and after questioning Salame about inconsistencies between his sworn plea allocution and the sworn declaration he submitted in support of his motion, Judge Kaplan stated "you are asking me to let stand a conviction and sentence that I now know is based on *false testimony [by Salame] before me during the plea allocution*" that no promises had been made to cause him to enter into the plea.  (*Id.* at 20:10-13.)  Judge Kaplan

noted that he would take the matter under advisement and would "surely retain jurisdiction with respect to the possibility of sanctions" against Salame.  (*Id.* at 23:1-3.)

**I.**     **Salame Provided the September and October 2024 Asset Spreadsheets, which Contained Omissions and Misrepresentations.**

34.     Salame finally provided a revised asset spreadsheet to the Debtors on September 13, 2024.  (Wheeler Decl. ¶ 52 & Ex. 9.)  However, that asset spreadsheet omitted *without any explanation* a large number of assets that had been on the original Salame DOJ Asset Spreadsheet, including three properties in Lenox, Massachusetts and the "accessible" and "inaccessible" cryptocurrency.  (Wheeler Decl. ¶ 52.)

35.     Because a settlement was contingent on the Debtors' understanding what had happened to each of Salame's assets and the proceeds thereof, the Debtors emailed Salame's counsel on September 19, 2024 explaining that:  (i) they had expected to receive the Salame DOJ Asset Spreadsheet with additional columns that showed the disposition and sale proceeds of each asset; and (ii) that a number of assets on the Salame DOJ Asset Spreadsheet had been omitted from the revised spreadsheet.  (*Id.* ¶ 53.)  Having not received accurate or comprehensive information from Salame about his assets, the Debtors sent a consolidated spreadsheet to Salame's counsel on September 19, 2024 and requested a call to walk through each of the assets to understand the discrepancies.  (*Id.* ¶ 54.)

36.     On the night of October 3, 2024—only one week before Salame was to report to prison—Salame's counsel sent the Debtors "a revised version of Ryan's asset spreadsheet providing updated status and related comments in respect of Ryan's assets" ("Salame October 2024 Asset Spreadsheet").  (*Id.* ¶ 55 & Ex. 10.)  The Salame October 2024 Asset Spreadsheet indicated that Salame intended to satisfy his $6 million forfeiture obligation by:  (i) having transferred $3.48 million of Solana to the U.S. Marshals; (ii) imminently

transferring to the U.S. Marshals approximately $592,000 of USDP and $601,000 of USDC; and (iii) transferring the $1.1 million that Salame expected to receive from the sale of his interest in RedBird.   (Wheeler Decl. ¶ 56 & Ex. 10 at 14-15.)   Additionally, Salame's counsel had previously informed the Debtors that the $300,000 Salame had realized from the sale of his interest in Kraken would also be used to satisfy the forfeiture.  (Wheeler Decl. ¶¶ 32, 56 & Ex. 10 at 15.)

37.     The Salame October 2024 Asset Spreadsheet included a column entitled "Value Realized" for the asset.  (Wheeler Decl. ¶ 57 & Ex. 10 at 13-16.)  The total of the Value Realized from the sales of all the Lenox-area and Texas properties was approximately $5.248 million.  (Wheeler Decl. Ex. 10 at 13.)  Although there was also a "Notes" column next to the "Value Realized" column on the Salame October 2024 Asset Spreadsheet, Salame had not included any notes for any of those properties.[4]   (*Id*.)   Because the entire point of the spreadsheet, as understood by the parties, was to identify and quantify the assets that would be available for transfer to the Debtors, the spreadsheet was affirmatively misleading by virtue of the fact that it indicated that *none* of the $5.248 million in proceeds from the sale of Lenox or Texas properties would be used to satisfy Salame's $6 million forfeiture obligation (as it was being satisfied by the sale of cryptocurrency and investment interests), and instead those proceeds were an asset available to be transferred to the Debtors pursuant to the settlement. (Wheeler Decl. ¶ 58.)

38.     In an attempt to consummate the settlement before Salame reported to prison on October 11, 2024, the Debtors analyzed the Salame October 2024 Spreadsheet over the weekend to determine what they believed would be the minimum value of the assets they would

---

[4]      For other assets, Salame reported in the Notes column that certain assets were "Duplicative of line 33. Should be omitted" or "This is inclusive of lines 32, 34-37 and should be omitted."  (Wheeler Decl. ¶ 57 & Ex. 10 at 14.)

recover from Salame pursuant to the settlement.  (*Id*.)  Based on (i) the months of discussions with Salame's counsel, (ii) Salame's representations in his sentencing memorandum that he would transfer to the Debtors all assets he did not use to satisfy forfeiture and restitution, (iii) Salame's sale of cryptocurrency and investment interests to satisfy forfeiture and restitution, (iv) the terms of the draft settlement agreement the parties had been finalizing, and (v) the inclusion on the Salame October 2024 Asset Spreadsheet of the Value Realized for the sales of the Lenox and Texas properties with no notes next to them, the Debtors reasonably believed that they would receive $5.248 million from the sale of the Lenox and Texas properties, in addition to other assets on the Salame October 2024 Asset Spreadsheet, such as the $1.146 million in Salame's Truist bank account. (*Id*.)

       39.    On October 7, 2024, the Debtors had a meeting with Salame's counsel to try to finalize the settlement agreement.  (*Id*. ¶ 59.)  The Debtors noted discrepancies on the Salame October 2024 Asset Spreadsheet, including that it stated that the property at 334 Padre Boulevard, South Padre Island, Texas had been "sold prior to the FTX collapse," when the Debtors' investigation indicated the closing occurred on November 22, 2022—*after* the FTX bankruptcy. (*Id*.)  During that meeting, the Debtors told Salame's counsel that, because of such discrepancies, the Debtors had included on Appendix A to the settlement agreement—which listed the assets (or proceeds thereof) that Salame was to transfer to the Debtors—*all* of Salame's assets (except properties that were currently listed for sale), even where Salame had indicated on the Salame October 2024 Asset Spreadsheet that he believed the asset was uncollectable or the entity was defunct. (*Id*.)  The Debtors explained that given the shortness of time, they would investigate after the execution of the settlement agreement to determine whether there was an entity or interest to be transferred. (*Id*.)

**J.      On the Eve of Settlement, the Debtors Learned That Salame Had Squandered Assets and Concealed Others.**

40.      In the days immediately preceding Salame's October 11, 2024 surrender date, Salame's counsel raised *for the first time* another multi-million dollar asset that Salame had failed to include on the Salame October 2024 Asset Spreadsheet, which had been provided to the Debtors only days earlier.   (Wheeler Decl. ¶ 60.)   In commenting on the draft settlement agreement on October 8, 2024, Salame's counsel noted *for the first time* that Salame had overpaid his 2022 taxes by approximately $3 million, but said that, rather than transfer that $3 million overpayment to the Debtors, he intended to apply it to his 2023 tax liability, to satisfy an IRS lien on his Potomac, Maryland home, and for any tax liability from ongoing IRS audits. (Wheeler Decl. Ex. 11 at 1.)

41.      In an October 8, 2024 email, Salame's counsel informed the Debtors that the Truist bank account listed on the October 2024 Salame Asset Spreadsheet as containing $1.146 million "has been/will be *further diminished as a result of his legal fees, including FEC counsel, appellate counsel and pardon counsel*" and that the "reduction could be *substantial*." (Wheeler Decl. ¶¶ 60, 64 & Ex. 10 at 16; Ex. 11 at 1 (emphasis added).)

42.      Salame's decision to spend assets that he had previously committed to return to the Debtors in order to satisfy his own tax liability and hire new lawyers to seek a pardon—even after he had pleaded guilty and was about to begin serving his 7.5 year sentence— is reminiscent of Judge Kaplan's comments regarding Salame's $5 million withdrawal from FTX.com on the eve of the bankruptcy that he used to pay for a public relations firm, legal fees,

and personal obligations: "It was me first, I'm getting in the life boat first, the heck with all those customers." (Wheeler Decl. Ex. 7 at 22:16-17.)[5]

43.     Then, in the most striking and most unexpected development of them all, on the afternoon of October 10, 2024—the day the Debtors and Salame were supposed to sign the settlement agreement because Salame was due to report to prison the next day—Salame's counsel informed the Debtors *for the first time that Salame had spent the proceeds of the sales of the Lenox and Texas properties that he had committed to transfer to the Debtors.* (Wheeler Decl. ¶ 64.) Notwithstanding that the Salame October 2024 Spreadsheet had a dollar amount in the Value Realized column for each of the Lenox and Texas properties—and those amounts totaled $5.248 million—Salame's counsel stated that *Salame had deposited the sale proceeds from those properties into his Truist account and had spent them.* (*Id.* & Ex. 10 at 13.) Salame's counsel reiterated the $1.146 million in his Truist account "has been/will be further diminished" by his spending on legal fees. (Wheeler Decl. ¶¶ 60, 64 & Ex. 11 at 1.) There was nothing in the "Notes" column of the Salame October 2024 Asset Spreadsheet that indicated that the sale proceeds had been spent or that the sale proceeds were duplicative of the amount in the Truist account. (Wheeler Decl. Ex. 10 at 13-16.)

44.     Given the parties' understanding since September 2023, the Debtors were shocked by this eleventh-hour revelation that Salame had spent over $6 million that was earmarked for the Debtors. The Debtors had relied on Salame's repeated confirmations that the Lenox and Texas properties would be sold to satisfy forfeiture and restitution obligations, as well as his representation to the SDNY Court that all assets after satisfying forfeiture and restitution would be transferred to the Debtors. (Wheeler Decl. ¶¶ 30-33, 35, 41 & Ex. 6 at 29-30.) The

---

[5]     In addition to his own "legal" fees, the Debtors believe Salame may also have dissipated assets to pay legal fees for his then-domestic partner Bond. (*See infra* ¶ 51).

Debtors had also reasonably relied on Salame's counsel's assurances that they were overseeing and advising Salame on his sale process for the properties (Wheeler Decl. ¶ 12), which would typically involve segregating those assets, such as in an escrow account.  Salame's conduct in surreptitiously squandering these Debtor funds on personal expenses, including counsel to seek a pardon for him, rather than returning the funds as he had committed to do, demonstrates his bad faith.

45.     It also appears that Salame surreptitiously squandered the $550,000 to $650,000 of Raydium tokens that Salame's counsel stated, during the May 15, 2024 meeting, that he had recently found.  (*Id.* ¶ 36.)   Neither Salame's September nor October Asset Spreadsheets included the Raydium tokens as an asset, suggesting that he had spent them between May and September of 2024.  (*See* Wheeler Decl. Ex. 9 at 9-11; Ex. 10 at 13-16.)

**K.     Salame Sold Properties to His Relatives Without Ever Listing Them for Sale and Sold Other Assets for Less Than Fair Market Value.**

46.     Shortly after the Debtors learned that Salame had spent the entirety of the proceeds of the property sales, the Debtors also learned that, despite the assurances they had received, Salame had, in fact, sold properties to relatives and a friend.  After asking their private investigators to look into Salame's property sales, the Debtors learned that Salame had sold a Sandisfield, Massachusetts property to his mother and brother and had sold a West Stockbridge, Massachusetts property to a "high school buddy," without ever listing them for sale.  (*See* Wheeler Decl. ¶¶ 69-71.)

47.     In addition, Salame also appears to have dissipated Debtor assets by failing to maximize the value received in the sale of his investment in RedBird.   The October 2024 Salame Asset Spreadsheet shows Salame sold his RedBird interest for a fraction of what he indicated, under penalty of perjury to the DOJ, he expected to receive for it, raising

questions about to whom he sold it, what process he used, and whether he failed to maximize value in doing so. (*See* Wheeler Decl. Ex. 10 at 15.) On the Salame DOJ Asset Spreadsheet, Salame stated that he "estimated" the "[b]uyout" of his RedBird interest at "85%" of its then value of $2.6 million—which would be over $2.2 million. (Wheeler Decl. Ex. 4 at 9.) Salame's October 2024 Asset Spreadsheet, however, indicated that he received only $1.1 million from the sale of his RedBird interest (Wheeler Decl. Ex. 10 at 15)—or only 50% of its estimated value— without providing any explanation for the huge decrease in the realized value.

**L.     Salame's Truist Statements Confirm His Dissipation of Debtor Assets and the Need for Discovery Regarding Salame's Assets.**

48.     After learning during the October 10, 2024 meeting that Salame had deposited the proceeds of the property sales into his Truist account and spent them, the Debtors requested that Salame produce a years' worth of Truist statements so that the Debtors could determine how Salame had spent the sale proceeds. (Wheeler Decl. ¶¶ 64-65.) On October 24, 2024, Salame's counsel provided the Truist statements from January 2024, when he appears to have opened the account, through September 2024. (*Id.* ¶ 68 & Ex. 13.)

49.     The Truist statements do not appear to support Salame's claim that he deposited into his Truist account the sale proceeds of *all eleven* properties sold since January 2024. While the Debtors identified deposits that may correspond to four of the eleven properties (less broker commissions or closing costs), the Debtors did not identify deposits corresponding to the sales of seven properties valued at more than $3.7 million—which raises questions about where those proceeds are.

| Sale Date | Sale Price | Deposit Date for Truist Account Deposit (if applicable) | Amount Deposited in Truist Account | Property |
|---|---|---|---|---|
| Jan. 22, 2024 | $147,816.00 | | None identified | 47 Stockbridge Road, West Stockbridge MA |
| Feb. 2, 2024 | $389,363.50 | | None Identified | 1098 E. Scallop, Port Isabel, TX |

| Sale Date | Sale Price | Deposit Date for Truist Account Deposit (if applicable) | Amount Deposited in Truist Account | Property |
|---|---|---|---|---|
| Feb. 2, 2024 | $255,000.00 | | None identified | 130 Padre Blvd, Unit 611, South Padre Island, TX |
| Feb. 2, 2024 | $581,393.68 | Feb. 5, 2024 | $581,393.68 | 80 Church Street, Lenox MA |
| Mar. 7, 2024 | $275,000.00 | March 8, 2024 | $258,665.00 | 6 Tucker Street, Lenox MA |
| Apr. 26, 2024 | $600,000.00 | | None identified | 7-9 Franklin Street, Lenox MA |
| Apr. 26, 2024 | $940,000.00 | | None identified | 27/29/31 Church St., Lenox MA |
| May 2, 2024 | $1,020,000.00 | | None identified | 27 Housatonic Street, Lenox MA |
| June 19, 2024 | $329,000.00 | June 24, 2024 | $326,928.00 | 53 Rood Hill Road, Sandisfield, MA |
| Sept. 4, 2024 | $375,000.00 | Sept. 20, 2024 | $362,503.13 | 121 E. Scallop, Port Isabel, TX |
| Sept. 17, 2024 | $335,000.00 | | None identified | 122 E. Scallop, Port Isabel, TX |

(Wheeler Decl. Ex. 13 at 5, 8, 18, 28.)

50.     As to the sale proceeds for the four properties that appear to have been deposited into the Truist account, the statements confirm that Salame squandered those funds on personal expenses.  The Truist statements reflect, among other things, Salame's payments of over $850,000 in credit card bills in only nine months, pool maintenance, a $50,000 software payment, and a $2,100 Bloomingdale's charge.  (*See id.*)  Debtor assets should not be used to fund Salame's extravagant lifestyle.

51.     Moreover, the Truist statements reflect three large wire transfers that could conceivably correspond to retainers for legal fees for himself and possibly Bond:

- A $250,000 wire on July 11, 2024, which preceded Salame's motion to withdraw his guilty plea that was filed on August 21, 2024 by new counsel Schaerr Jaffe, and thus could conceivably be a retainer for that firm.  (*Id.* at 21.)

- A $1,000,000 wire on August 27, 2024, which is the same date that Duane Morris filed a notice of appearance in Bond's criminal case, and thus could conceivably be a retainer for that firm.  (*Id.* at 25.)

- A $100,000 wire on September 24, 2024, which preceded Salame's motion for a continuance of his surrender date filed on October 9, 2024 by new counsel Schlam Stone & Dolan, and thus could conceivably be a retainer for that firm.  (*Id.* at 28.)

Because the Truist statements do not identify the recipients of these wire transfers, absent discovery, the Debtors cannot know for certain how Salame spent these Debtor funds and whether he improperly spent them on his and Bond's legal fees.

52.     The Truist statements also reflect transfers of $10,000 and $65,000 to a bank account -6999, which is not an account Salame has identified as belonging to him, raising questions about the identity of the person to whom he is transferring Debtor assets.  (*Id.* at 7, 17.)

**M.     There Is a Serious Risk that Salame Will Dissipate His Remaining Assets Absent an Injunction.**

53.     Absent an injunction, there is a serious risk that Salame will sell his remaining assets and spend the proceeds.  Salame has a number of real properties that are currently listed for sale or that are in contract.  For example, the Salame October 2024 Asset Spreadsheet indicated that a property Salame owns in Lisbon, Portugal had a "pending" sale for $700,000.  (Wheeler Decl. Ex. 10 at 13.)  His Airstrip in Connecticut and properties in Hong Kong and Bali are currently listed for sale.  (*Id.*)

54.     Moreover, on October 10, 2024, the *New York Times* published an article stating that Salame planned to sell his $4 million Potomac home and that the proceeds were being surrendered.  (Wheeler Decl. ¶ 62 & Ex. 12.)  Although the Debtors asked Salame's counsel about the report and Salame's counsel represented that the statement was inaccurate, the Debtors put no faith in those assurances.  (Wheeler Decl. ¶ 63.)

55.     In addition, Salame's October 2024 Asset Spreadsheet states that he has $320,000 of TON, $75,000 of BTC, $40,000 of DESO, $100,000 in a Crypto.com account, and $179,300 in other bank accounts.  (Wheeler Decl. Ex. 10 at 13-15.)  There is every reason to believe that Salame will dissipate these assets just as he did the Truist account and the Raydium tokens.

56.     Absent an injunction, the Debtors justifiably have no confidence that Salame will properly safeguard the proceeds of the sales of any of his remaining properties or the remaining $700,000 in cash and cryptocurrency he currently has.[6]   The risk of dissipation is particularly real given that Salame, who is incarcerated, and Bond, who has been indicted, have no income and thus may spend the remaining assets on personal expenses.

### ARGUMENT

### I.     INJUNCTIVE RELIEF IS AVAILABLE BECAUSE THE COMPLAINT ASSERTS CLAIMS UNDER DUFTA, SEEKS THE RETURN OF PROPERTY AS EQUITABLE RELIEF, AND ASSERTS EQUITABLE CLAIMS.

57.     Before considering whether a preliminary injunction is appropriate, a court must first assess the threshold question of whether the movant's claims provide a valid basis for such relief, consistent with the Supreme Court decisions in *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) and *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33 (1989).   *See In re BYJU's Alpha,* 661 B.R. at 118-19.   If a plaintiff's claims and remedies are exclusively legal in nature, a court cannot order a preliminary injunction.   *See id.* at 119-20 (citing *Grupo Mexicano*, 527 U.S. at 330-33; *Granfinanciera*, 492 U.S. at 46-47). However, a preliminary injunction may be appropriate where the movant (1) asserts state law claims that provide an independent basis for equitable relief, (2) asserts equitable claims, or (3) seeks equitable relief in the underlying complaint.   *Id.* at 119-22; *In re Team Sys.*, 2023 WL 1428572, at *8-9.

58.     Here, the Debtors' Complaint contains at least three independent bases upon which the Court may rely to grant a preliminary injunction.   *First*, the Debtors have pleaded a claim under DUFTA, which, as this Court has recognized, provides an independent

---

[6]     Salame cannot sell his condo at E11even Hotel & Residences, Unit 4503, 20 NE 11th St., Miami., FL until the building is completed.

basis for injunctive relief. *In re BYJU's Alpha*, 661 B.R. at 121. *Second*, the Debtors seek

equitable remedies for several claims, including the return of specific real property assets. *Third*,

the Debtors assert equitable claims, including aiding and abetting breaches of fiduciary duties.

**A.**     **The Complaint Asserts Fraudulent Transfer Claims under DUFTA, Which Provides an Independent Basis for the Court to Issue Injunctive Relief.**

59.     This Court has a proper basis to issue a preliminary injunction because the

Complaint asserts claims against Salame under DUFTA (Compl. Counts 3 & 4). In *Grupo*

*Mexicano*, the Supreme Court noted that state law may provide an independent basis for the

grant of injunctive relief in fraudulent conveyance cases. *See* 527 U.S. at 324 n.7. DUFTA

authorizes "[a]n injunction against further disposition by the debtor or a transferee" of the assets

transferred or of other property or "[a]ny other relief the circumstances may require." Del. Code

Ann. tit. 6, § 1307(a)(3). This Court has expressly held that it may grant injunctive relief in

reliance on DUFTA, even where the complaint seeks only legal remedies. *In re BYJU's Alpha,*

*Inc.*, 661 B.R. at 121 (noting that DUFTA grants "courts the broad authority to issue

prejudgment injunctions that fit the exigencies of the particular case"). Because the Complaint

asserts claims against Salame under DUFTA, preliminary injunctive relief is available to the

Debtors.

**B.**     **The Equitable Relief Sought in the Complaint Provides Another Independent Basis for the Issuance of Injunctive Relief.**

60.     This Court also has a proper basis to issue a preliminary injunction

because the Complaint seeks the return of specific real property assets as relief for the fraudulent

transfer claims. In the context of a fraudulent transfer action, the nature of the claim is

contingent on the relief sought by the plaintiff. *In re BYJU's Alpha, Inc.*, 661 B.R. at 118-19. If

a plaintiff only seeks legal remedies, such as monetary damages, then the fraudulent transfer

claim is properly categorized as legal and cannot be the basis for injunctive relief. *Id.* (citing

*Grupo Mexicano*, 527 U.S. at 333; *Granfinanciera*, 492 U.S. at 46-47).  However, where, as here, the Complaint seeks the return of particular assets—*i.e.*, unsold real estate purchased with Debtor funds—the fraudulent transfer claims sound in equity, and the court may grant injunctive relief if otherwise appropriate.  *In re Team Sys.*, 2023 WL 1428572, at *8 (noting that a fraudulent transfer claim is "equitable to the extent it seeks the return of a specific asset").

61.  Here, the Complaint seeks, among other things, as relief for the fraudulent transfer claims the return of six real properties that Salame purchased with Debtor funds and has not yet sold:

- Airstrip, 543 and 547 West Main St., North Canaan, CT;

- E11even Hotel & Residences, Unit 4503, 20 NE 11th St, Miami, FL;

- Jalan Raya Semer Pertokoan Kencana No. 1, Lingkungan Dukuh Sari, Kelurahan Kerobokan Kelod, Kecamatan Kuta Utara, Kabupaten Dalung, Bali, Indonesia;

- Unit, Praça Príncipe Perfeito, Avenida Dom João II, Parque das Nações, Lisboa, Portugal;

- 7th Floor, Morrison Plaza, No. 9 Morrison Hill Road, Wan Chai, Hong Kong; and

- 9800 Avenel Farm Drive, Potomac, MD.

(Compl. ¶¶ 64, 113-15, 117, 121, 194.)

62.  By way of example, as demonstrated in the Complaint, Salame purchased the Airstrip and adjacent land in Connecticut for $1.3 million on August 27, 2021 using $1.2 million that he withdrew from his FTX.com exchange account to his personal Greylock bank account on August 2, 2021 and another 100,000 USDC that he withdrew from his FTX.com account on August 6, 2021.  (*Id.* ¶ 114; *see also id.* ¶ 115 (detailing Salame's purchase of the E11even condo unit with an FTX.com withdrawal).)  Because the Complaint seeks the equitable remedy of the return of specific unsold real properties (*id.* ¶ 194), the fraudulent transfer claims are equitable in nature.  A preliminary injunction is therefore available on this basis.

**C.** **The Equitable Claims of Aiding and Abetting Breaches of Fiduciary Duties Asserted in the Complaint Provide Another Independent Basis for the Issuance of Injunctive Relief.**

63.     This Court also has a proper basis to issue a preliminary injunction because the Debtors assert equitable claims.  This Court has recognized that even if a plaintiff seeks monetary damages with respect to a claim of fraudulent transfer, injunctive relief may be appropriate if the plaintiff simultaneously alleges claims "sounding in equity."  *In re BYJU's Alpha*, 661 B.R. at 121 (quoting *In re Team Sys.*, 2023 WL 1428572, at *9 n.54) ("So long as one of the plaintiffs' viable claims sounds in equity, the case would fit within *Grupo Mexicano*'s equitable exception even if that equitable claim is joined with a legal claim.").

64.     Here, the Debtors have asserted multiple counts of aiding and abetting breaches of fiduciary duties, including under Delaware law, British Virgin Islands law, and Antigua and Barbuda law.  Courts have long held that an action for breach of fiduciary duty sounds in equity.  *See In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 544 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity'") (quoting *In re Evangelist*, 760 F.2d 27, 29, 31 (1st Cir. 1985)).  The fact that the Debtors have pleaded claims for aiding and abetting breaches of fiduciary duties does not change that result.  *See Damage Recovery Sys., Inc.* v. *Tucker*, 2005 WL 388597, at *2 (D. Del. Feb. 2, 2005) ("[T]he fact that a breach of fiduciary duty claim is equitable in nature makes plaintiff's claim that defendant aided and abetted a breach of fiduciary duty equitable as well.").  Accordingly, a preliminary injunction is available on this basis as well.

**II.     THE DEBTORS SATISFY THE ELEMENTS FOR A PRELIMINARY INJUNCTION TO PROHIBIT SALAME FROM FURTHER DISSIPATING DEBTOR ASSETS.**

65.     In the Third Circuit, when evaluating a motion for a preliminary injunction, courts first consider two "gateway factors":  (1) whether the movant has "a

reasonable probability of eventual success in the litigation"; and (2) whether the movant "will be irreparably injured" absent an injunction. *Reilly* v. *City of Harrisburg*, 858 F.3d 173, 176 (quoting *Del. River Port Auth.* v. *Transam. Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

66.     If the court finds that the movant has satisfied those factors, the court will consider whether, on balance, the first two factors along with (3) "the possibility of harm to other interested persons from the grant or denial of the injunction"; and (4) the "public interest," weigh in favor of a preliminary injunction. *See, e.g.*, *Urban Commons Queensway, LLC* v. *EHT Asset Mgmt., LLC*, 2021 WL 3828556, at *1 (Bankr. D. Del. Aug. 27, 2021).  Here, the Debtors satisfy all four factors and are therefore entitled to a preliminary injunction.

### A.     The Debtors Have Demonstrated a Likelihood of Success on the Merits.

67.     The Debtors have more than met their burden of showing that they have a likelihood of success on the merits of their claims against Salame.  As an initial matter, to demonstrate likelihood of success on the merits, the Debtors need only make "a *prima facie* case," *i.e.*, "a showing significantly better than negligible but not necessarily more likely than not." *In re Team Sys.*, 2023 WL 1428572, at *10.  Given that Salame has already pleaded guilty and admitted to facts that form the bases of the Debtors' claims—namely, that he received tens of millions of dollars from Debtor bank accounts and used those funds to make political contributions in his own name at the direction of Bankman-Fried and in so doing violated federal election laws—the Debtors can satisfy their burden on that basis alone.  (*See* Wheeler Decl. ¶ 4 & Ex. 2 at 21:18-22:9.)  Under the doctrine of collateral estoppel, once an issue has been "determined by a court of competent jurisdiction," that ruling is "conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Anderson* v. *Comm'r*, 698 F.3d 160, 164 (3d Cir. 2012) (quoting *Montana* v. *United States*, 440 U.S. 147,

153-54 (1979)).  It is a well-established principle that a criminal defendant is estopped from relitigating issues in a subsequent civil lawsuit if those issues were determined in the criminal proceeding.  *James* v. *Heritage Valley Fed. Credit Union*, 197 F. App'x 102, 105 (3d Cir. 2006).  If, as in this case, "a conviction is the result of a guilty plea, its preclusive effect extends to all issues that are necessarily admitted in the plea."  *Anderson*, 698 F.3d at 164.

> **1.    Salame's Guilty Plea Establishes That He Aided and Abetted the FTX Insiders' Breaches of Fiduciary Duties.**

68.    To establish that Salame aided and abetted breaches of fiduciary duties, the Debtors ultimately must establish that (1) a fiduciary relationship existed, (2) that duty was breached, (3) Salame knowingly participated in that breach, and (4) there are damages proximately caused by the breach.  *See Malpiede* v. *Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citing *Penn Mart Realty Co.* v. *Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).  Salame's plea of guilty to conspiracy to make unlawful political contributions establishes the Debtors' likelihood of success on the merits as to the Debtors' claims that Salame aided and abetted Bankman-Fried's and Singh's breaches of fiduciary duties.

69.    First, there is no doubt that Bankman-Fried and Singh, as executive officers of the FTX Group, owed fiduciary duties to the FTX Group.  *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 349 (Del. Ch. 2023) ("The Delaware Supreme Court has held that under Delaware law, corporate officers owe the same fiduciary duties as corporate directors."); *Byers* v. *Ningning* [2021] UKPC 4, [16] (appeal taken from British Virgin Is.), https://www.jcpc.uk/cases/docs/jcpc-2019-0082-judgment.pdf (describing the fiduciary duties to act honestly and in good faith owed by directors and those "whose role in the affairs of [the company] . . . justifie[s] the imposition of fiduciary duties").

70.    Second, it has also been well established that Bankman-Fried and Singh breached their fiduciary duties by taking assets from Alameda and North Dimension to make tens of millions of dollars in political contributions in their own names.  For example, Singh pleaded guilty to conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act in connection with his illegal political donations.  (Wheeler Decl. Ex. 16 at 2.)  During his plea allocution, Singh testified that "I agreed with others at FTX and Alameda to make political donations in my name that were funded in part by transfers from Alameda . . . . I understood that the donations were in part for the benefit of Sam Bankman-Fried and FTX and their ability to be politically influential.  I also understood that any reporting of the donations would conceal that the money came from Alameda.  And I knew at that time that Alameda money had to be coming, effectively, from FTX customer funds."  (Wheeler Decl. Ex. 18 at 33:7-18.)  And as the Government noted in its sentencing submission as to Bankman-Fried:

> [T]he trial evidence established [that Bankman-Fried] passed these [political] donations through accounts belonging to Ryan Salame and Singh (both of whom pled guilty to conspiracy to violate the campaign finance laws).  All of the contributions that were funded by Alameda or the defendant, but reported in the names of Salame or Singh, violated the campaign finance laws. Likewise, all of the contributions that were funded by Alameda, a corporation, and made to individual candidates violated the prohibition on corporate contributions to candidates.

(Wheeler Decl. Ex. 17 at 19 (internal citations omitted).)  In misappropriating Debtor funds to make political contributions in violation of federal campaign laws, Singh and Bankman-Fried breached their fiduciary duties.

71.    Third, Salame's own guilty plea establishes his knowing assistance in Singh's and Bankman-Fried's breaches of fiduciary duties.  During his plea allocution, Salame admitted that, from the fall of 2021 to November of 2022, he coordinated with Bankman-Fried to make "tens of millions of dollars" in "political contributions in [his own] name that were funded

by transfers from the bank accounts of an Alameda subsidiary." (Wheeler Decl. Ex. 2 at 21:18-23). Salame went on to testify that "[w]hile at the time these funds were categorized in both my own and Alameda's ledgers as loans, I understood then that the loans would eventually be forgiven and I never intended to repay them." (*Id.* at 21:23-22:1.)

72.     In addition, Singh testified at Bankman-Fried's trial that he conspired with Salame and Bankman-Fried to violate the campaign finance laws. He testified that the political donations were coordinated through a Signal chat called "donations processing" in which Bankman-Fried and others selected the candidates to receive donations and "Salame, who had access to [Singh's] bank account, would transfer money out of [Singh's] bank account" to make the donations. (Wheeler Decl. Ex. 15 at 1421:9-19; *id.* at 1422:20-1423:3 (Singh's testimony that "Salame had access to my bank account, to Sam [Bankman-Fried]'s bank account, and that he would like log in to my account at Prime Trust, that's where I had a bank account, would send and specify the details for a wire to be [sent] to a political candidate or a super PAC").)

73.     Fourth, there is no doubt that the FTX Group was harmed by the FTX Insiders' breaches of fiduciary duties, because more than $100 million of FTX Group funds was misappropriated and spent on political donations. (Wheeler Decl. Ex. 19 at 1.) The vast majority of these donations will never be recovered for the estates because the recipients spent the money on the 2022 elections, many recipients lost their elections and no longer have campaigns from which to recover, and many donations were made in $2,900 increments that are not cost-effective to pursue.

**2.     Salame Received Intentional Fraudulent Transfers.**

74.     To succeed on their intentional fraudulent conveyance claims, the Debtors must ultimately prove that Salame received transfers of Debtor property and that each of those transfers was made with the intent to hinder, delay, or defraud present or future creditors. *See*

11 U.S.C. § 548(a)(1)(A); Del. Code Ann. tit. 6, § 1304(a)(1).[7]  Given Salame's guilty plea with respect to violations of federal campaign law, there can be no doubt that the Debtors have established a likelihood of success on the merits of intentional fraudulent transfers.

75.     Salame's guilty plea to campaign finance violations establishes the Debtors' likelihood of success on the intentional fraudulent transfer claims.   In his plea allocution, Salame admitted that "[b]etween the fall of 2021 and November of 2022 mid-term elections, I made political contributions in my name *that were funded by transfers from the bank accounts of an Alameda subsidiary [i.e., North Dimension].*   During this time I made tens of millions of dollars in campaign contributions to candidates for public office and political action committees."   (Wheeler Ex. 2 at 21:18-23 (emphasis added).)   In addition to Salame's admissions, the Court can rely on the Second Interim Report of John Ray which found that Salame had received at least $26 million in transfers in 2022 from a North Dimension bank account to fund political contributions.  [D.I. 1704-1 at 24.]  Thus, the Debtors have conclusively established that Salame received transfers of Debtor property to fund his political donations.

76.     Salame's admissions during his plea allocution also establish that the transfers from the Debtors to fund political contributions were made with the intent to hinder, delay, or defraud FTX Group creditors.   In connection with his guilty plea as to conspiracy to operate an unlicensed money transmitting business, Salame admitted that he was aware that FTX Group customers deposited fiat into bank accounts in the names of Alameda and an Alameda subsidiary.  (Wheeler Decl. Ex. 2 at 23:6-18.)  During his plea allocution, Salame also admitted

---

[7]     If direct evidence of fraudulent intent is not available, courts may rely on circumstantial evidence, typically referred to as "badges of fraud" to infer intent.  *In re Hechinger Inv. Co. of Del.*, 327 B.R. at 550-51.  In this case, several badges of fraud are present from which the Court can infer fraudulent intent:  Salame held positions of power in the FTX Group and was a high-ranking member in Bankman-Fried's inner circle; the Debtors were insolvent at the time of the transfers (*see infra* ¶¶ 78-79); the Debtors did not retain control or dominion over the assets transferred—indeed, the assets transferred were donations to political causes made in his name; and each and every one of those transfers was conducted with subterfuge to throw off the FEC.

that his political donations were funded by transfers from an Alameda subsidiary's bank accounts, that these transfers were categorized as loans from Alameda, and that he had no intention of repaying the loans to Alameda.  (*Id.* at 21:18-22:1.)  The Debtors' investigation has established that the Alameda subsidiary involved in funding Salame's political contributions was North Dimension.  (Compl. ¶ 73.)  Further, the Second Interim Report of John Ray established the North Dimension account that funded Salame's political contributions contained commingled customer and corporate funds.  [D.I. 1704-1 at 8, 14-15 (noting that North Dimension Account - 8738 contained commingled customer funds)]; (Compl. ¶ 73 (listing transfers Salame received from North Dimension Account -8738 and the corresponding political contributions he made).)  Thus, because Salame accepted transfers of funds from North Dimension accounts that he knew contained commingled funds and he had no intention of repaying those funds, Salame had an intent to hinder, delay, or defraud FTX Group creditors.

### 3.   Salame Received Constructive Fraudulent Transfers.

77.   To prevail on their constructive fraudulent conveyance claims, the Debtors must establish that Salame received transfers of Debtor property, that the Debtors received less than a reasonably equivalent value in exchange, and that each of the Debtors: (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) were engaged in a business or a transaction for which any property remaining with the Debtors was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Debtors' ability to repay as such debts matured.  *See* 11 U.S.C. § 548(a)(1)(B); Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305.

78.   The Debtors have demonstrated a likelihood of success on the merits of their constructive fraudulent transfer claims with respect to the transfers to Salame to make political contributions.  As an initial matter, Salame admitted in his plea allocution that he

received tens of millions of dollars in transfers from an Alameda subsidiary in 2022 in connection with his political contributions.  (Wheeler Decl. Ex. 2 at 21:18-23.)  There is no dispute that the Debtors received little to no value in exchange for the millions of dollars in transfers to Salame to make political contributions.  Finally, many of the transfers at issue were made in the months immediately prior to the November 2022 election (Compl. ¶ 73 (detailing transfers from the Debtors beginning in May 2022 to fund 29 political contributions totaling $28.1 million)), when testimony during Bankman-Fried's trial established that Alameda was insolvent.  For example, Caroline Ellison, the CEO of Alameda, testified that she first became concerned that Alameda might be insolvent "around May of 2022."  (Wheeler Decl. Ex. 15 at 1060:10-13.)  Ellison also testified about a June 19, 2022 spreadsheet (Gov't Ex. 44) that listed $9.9 billion in borrows from FTX Group customers, which she said "made it clear that Alameda was in a risky situation because if customers tried to withdraw those funds, then we wouldn't be able to pay them back."  (*Id.* at 789:19-24.)  In addition, Ellison testified about an August 2022 conversation in which the FTX Insiders discussed Alameda's "very risky position where we were borrowing over $10 billion from FTX [customer funds] and we didn't have assets to repay that."  (*Id.* at 847:11-848:13.)

79.    Because Salame received millions of dollars of transfers from an Alameda subsidiary during a period when Ellison has testified that Alameda was insolvent or at a risk of becoming insolvent,[8] the Debtors have shown a likelihood of success on the merits of their constructive fraudulent transfer claims.

---

[8]    This Court recently held that "the substantive consolidation of the Debtors' estates means that the Court can look to the aggregate solvency of the Debtors' estates at this stage of the case."  *See* Mem. Op., *Alameda Research Ltd.* v. *Giles*, Adv. No. 23-50380, at 9-13, 25 n.32 (Bankr. D. Del. Oct. 23, 2024) [Adv. D.I. 288].  Accordingly, Alameda and its North Dimension subsidiary should be treated as one merged entity.

### 4.      Salame Received Preferential Transfers.

80.      In order to establish a preference claim, the Debtors must prove that: (1) Salame received transfers of Debtor property; (2) those transfers were made to or for Salame's benefit and on account of an antecedent debt; (3) those transfers were made while the Debtors were insolvent; (4) those transfers were made within one year of the November 11, 2022 Petition Date;[9] and (5) Salame received more than he would have received if: (i) the Debtors' Chapter 11 Cases were cases under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amounts paid to Salame on account of the debt were determined by the Bankruptcy Code.  *See* 11 U.S.C. § 547(b).

81.      *First*, the Debtors have shown that Salame received at least $82.6 million in transfers of Debtor assets from November 2021 to November 2022.  (Compl. Exs. A, C.)

82.      *Second*, Salame admitted receiving tens of millions in transfers from the Debtors in 2022 which he used to make political contributions in his own name.  (Wheeler Decl. Ex. 2 at 21:18-22:9.)  Ellison testified during Bankman-Fried's trial that Salame had received $35 million in loans from Alameda to make political contributions.  (Wheeler Decl. Ex. 15 at 689:18-690:3.)  Because the transfers were made pursuant to loans from Alameda to Salame, the transfers were on account of an antecedent debt.  *See In re NewPage Corp.*, 569 B.R. 593, 599 (D. Del. 2017).

83.      *Third*, as demonstrated above in paragraphs 78-79, the transfers were made when the Debtors were insolvent.

---

[9]      Because Salame is an insider for purposes of 11 U.S.C. § 547(b), the relevant period for the preferential transfers to Salame is one year.  There is no dispute that Salame was a "person in control" of the Debtors—having made management decisions of the Debtors, directed payment of the Debtors' expenses, and had more ability to assert control than other creditors.

84.     *Fourth*, the transfers were made within one year of the Petition Date. (Compl. Exs. A, C.)

85.     *Fifth*, Salame received more through the preferential transfers than what he would have received under a Chapter 7 liquidation.   In confirming the Debtors' Plan, this Court found that "[t]he liquidation analysis attached as <u>Appendix D</u> to the Disclosure Statement . . . establish[es] that recoveries for non-accepting Holders of Allowed Claims and Allowed Interests in every Class under the Plan on account of such Claim or Interest, as of the Effective Date, will have a value equal to or greater than the amount such Holder would receive if the applicable Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code." [D.I. 26404 ¶¶ 63, 64.]

### B.     Absent Injunctive Relief to Prevent Salame from Further Dissipating Debtor Assets, the Debtors Will Be Irreparably Harmed.

86.     The Debtors have established that they will be irreparably harmed absent injunctive relief.  A movant demonstrates irreparable harm if denial of the injunction will cause harm "which cannot be redressed by a legal or an equitable remedy following a trial."  *In re DBSI, Inc.*, 409 B.R. 720, 736 (Bankr. D. Del. 2009) (quoting *Instant Air Freight Co.* v. *C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).  Where, as here, assets are at risk of dissipation, courts routinely find irreparable harm.  *In re Team Sys.*, 2023 WL 1428572, at *12.  Asset freezes are "designed to preserve the status quo by preventing the dissipation and diversion of assets."  *SEC* v. *Chappell*, 107 F.4th 114, 129 (3d Cir. 2024) (quoting *SEC* v. *Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000)).  Courts should be "especially sensitive" to the risk of asset dissipation in the context of a bankruptcy.  *In re Am. Tissue*, 2006 WL 3498065, at *3.

87.     As is demonstrated in the Wheeler Declaration, Salame has already dissipated at least $5 million of the proceeds of property sales and $1 million in the Truist

account, which Salame had committed to transfer to the Debtors pursuant to a settlement. (*See* Wheeler Decl. ¶¶ 64, 67.) Worse yet, Salame concealed from the Debtors the fact that he had spent the sale proceeds until the day the Debtors and Salame were supposed to execute the settlement agreement. (*Id.* ¶ 64.) Salame spent some of the funds on legal fees, including retaining counsel to try to obtain a pardon for himself, and it appears from Salame's Truist statements that he may also have spent $1 million of those funds to pay a retainer to criminal counsel for his domestic partner Bond. (Wheeler Decl. Ex. 11 at 1 & Ex. 13.) In addition to legal fees, Salame's Truist statements demonstrate that he spent $850,000 of the funds to pay credit card bills. (*See* Wheeler Decl. Ex. 13.) Simply put, Salame's willingness to squander millions of dollars of Debtor assets on personal expenses shows he cannot be trusted to preserve and safeguard the Debtor assets at issue in this litigation.

88. Indeed, this is the exact same conduct for which Judge Kaplan admonished Salame at sentencing, noting that Salame had "spent millions from the more than $5 million [he] got out just before the collapse came on hiring a public relations firm, paying off personal obligations, and the like. It was me first, I'm getting in the life boat first, the heck with all those customers." (*See* Wheeler Decl. Ex. 7 at 22:13-17.)

89. Given Salame's past dissipation of assets combined with the fact that neither Salame (who is incarcerated) nor his now wife (who has been indicted) is earning any income at the moment, there is a serious risk that, absent an injunction, Salame will dissipate his remaining assets, thereby depriving the FTX Group creditors of them. For example, the Salame October 2024 Asset Spreadsheet indicates that the property he owns in Lisbon, Portugal has a pending sale for $700,000. (Wheeler Decl. Ex. 10 at 13.) In addition, a number of Salame's other properties (the Airstrip, Bali, and Hong Kong properties) are currently listed for sale, and

the *New York Times* reported that his Potomac, Maryland house would be "sold, with the proceeds surrendered." (*Id.* & Ex. 12.)  Absent an injunction, there is nothing to prevent Salame from selling those properties and spending the proceeds.

90.     Salame's "substantial" further dissipation of the cash in the Truist account from $1.146 million on October 3, 2024 to virtually nothing by October 8, 2024 underscores the dire need for a preliminary injunction here.  For example, Salame appears surreptitiously to have spent the $550,000 to $650,000 in Raydium tokens Salame's counsel said Salame found during the May 15, 2024 call.  (Wheeler Decl. ¶ 36.)  The Raydium tokens appear nowhere on the asset spreadsheet sent to the Debtors in September 2024 or on the Salame October 2024 Asset Spreadsheet, suggesting that he spent those too.  (Wheeler Decl. Exs. 9, 10.)  Salame's October 2024 Asset Spreadsheet indicates that he still has $320,000 of TON tokens, $75,000 of BTC, $40,000 of DESO, $100,000 in a Crypto.com account, and $179,300 in other bank accounts that are at serious risk of dissipation based on his proclivity to spend any asset that is not locked down.  (*See* Wheeler Decl. Ex. 10 at 13-16.)

91.     Moreover, there is also evidence that Salame dissipated Debtor assets by failing to maximize the proceeds from the sale of certain assets.  Despite assurances from Salame's counsel that he would not sell properties to his mother or friends, he did just that:  he sold a Sandisfield, Massachusetts property to his mother and brother and sold a West Stockbridge, Massachusetts property to a "high school buddy" without ever listing the properties for sale to determine the market price.  (*See* Wheeler Decl. ¶¶ 70-71.)  Similarly, despite having indicated on the Salame DOJ Asset Spreadsheet that he expected to sell his RedBird interest for 85% of its then $2.6 million value (which would yield $2.2 million), without any explanation, Salame reported on the October 2024 Salame Asset Spreadsheet that he had received only 50%

of that amount, or $1.1 million for the sale of his RedBird interest.  (*See* Wheeler Decl. Ex. 4 at 9; Ex. 10 at 15.)

92.     This is exactly the type of case where a preliminary injunction is necessary to "preserve the status quo by preventing the dissipation and diversion of assets."  *Chappell*, 107 F.4th at 129 (quoting *Infinity Grp. Co.*, 212 F.3d at 197).  Ensuring that assets are not further dissipated is critical here, given that this is an adversary proceeding in a bankruptcy context.  *See In re Am. Tissue*, 2006 WL 3498065, at *3.  Accordingly, the Debtors have established that they will be irreparably harmed absent injunctive relief.

**C.     There Is No Meaningful Harm to Any Other Interested Party.**

93.     Salame will not suffer any meaningful harm if this Court grants a preliminary injunction freezing his assets pending the outcome in this litigation.  To begin, Salame does not have a legitimate interest in the assets at issue, because Salame obtained them through transfers of misappropriated Debtor assets.  Freezing Salame's assets for the pendency of this litigation, especially after Salame has already squandered away millions of dollars, will not cause him any meaningful harm.  If "the Debtor is the party that stands to lose the most in these proceedings, . . . any unforeseen ancillary harm to third parties is insignificant when compared to the Debtor's stake in this action."  *In re BYJU's Alpha*, 661 B.R. at 126.

**D.     Granting a Preliminary Injunction Serves the Public Interest.**

94.     The fourth and final factor—the public interest—weighs in favor of granting an injunction.  Bankruptcy courts have held that "[t]he public interest is served when the Court imposes relief [that] . . . protects bankrupt estates from misappropriation of assets."  *In re Team Sys.*, 2023 WL 1428572, at *13 (quoting *In re Am. Tissue*, 2006 WL 3498065, at *5).  Granting an injunction would protect the bankruptcy processes that are currently underway and prevent Salame from further dissipating Debtor assets that should ultimately be returned to the

true victims in this case—FTX Group creditors.  In fact, every creditor of the Debtors' estates will benefit from the issuance of an injunction.

## III.   THE COURT SHOULD GRANT EXPEDITED DISCOVERY INTO THE DISSIPATION OF SALAME'S ASSETS.

95.   Given that Salame has repeatedly concealed assets from the DOJ and the Debtors—even under penalty of perjury—and surreptitiously squandered over $6 million of Debtor assets that he had committed to return to the Debtors, the Court should grant expedited discovery, including the issuance of Rule 45 subpoenas, regarding the dissipation of his assets.

96.   As a general matter, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by . . . a court order."  Fed. R. Civ. P. 26(d)(1).  Courts have "broad discretion" to grant expedited discovery if the circumstances so warrant.  *Kone Corp*. v. *Thyssenkrupp USA, Inc*., 2011 WL 4478477, at *3 (D. Del. Sept. 26, 2011).  Neither the Federal Rules of Civil Procedure nor the Third Circuit prescribes a standard for granting expedited discovery.  *Id.*  Courts in this District follow one of two approaches.  The first "analyzes the expedited discovery request using factors similar to those used for injunctive relief or specific performance."  *BAE Sys. Aircraft Controls, Inc*. v. *Eclipse Aviation Corp*., 224 F.R.D. 581, 587 (D. Del. 2004) (citing *Notaro* v. *Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)).  The second approach is less stringent, requiring the movant to show "good cause," or essentially that the discovery is "'reasonable' in light of the relevant circumstances."  *Kone Corp*., 2011 WL 4478477, at *4 (citing *Better Packages, Inc*. v. *Zheng*, 2006 WL 1373055, at *3 (D.N.J. May 17, 2006)).

97.   Under either standard, the Debtors are entitled to expedited discovery because Salame has repeatedly concealed assets from the DOJ and the Debtors.  Salame omitted $4 million of Solana and Raydium tokens from the Salame DOJ Asset Spreadsheet, which he

submitted under penalty of perjury.  It appears that Salame only "discovered" the Solana and Raydium tokens after he had spent the proceeds of the Lenox and Texas property sales on personal expenses and had to come up with other assets to satisfy the $6 million in DOJ forfeiture that he owed.  Similarly, cryptocurrency that Salame had sworn to the DOJ was "inaccessible" miraculously became "accessible" after the Debtors caught Salame transferring funds from an allegedly "inaccessible" wallet to purchase a meme coin with Salame's face on it.  And after he had submitted three different asset spreadsheets—none of which disclosed any multi-million dollar tax overpayment—Salame raised for the first time at the eleventh hour a $3 million alleged overpayment of his IRS taxes, only because the draft settlement agreement contained a provision that enabled the Debtors to void the settlement if Salame misrepresented or omitted any assets from the Salame October 2024 Asset Spreadsheet.

98.     Moreover, given Salame's dissipation of more than $6 million in Debtor assets, including over $1 million from the Truist account in only days, the Debtors are entitled to expedited discovery of how Salame spent those funds so that the Debtors may attempt to recover them.  For example, to the extent Salame spent Debtor funds to pay legal retainers for pardon counsel, appeal counsel, IRS counsel, FEC counsel, or criminal defense counsel for Bond, the Debtors could seek to recover any unspent retainers from those law firms.

**CONCLUSION**

99.     For all the above reasons, the Court should enter the Proposed Order attached as **Exhibit 1** to the Motion, enjoining Salame from further dissipating assets, or the proceeds thereof, without prior Court approval, granting expedited discovery, including the issuance of Rule 45 subpoenas, regarding the dissipation of Salame's assets, and granting such further relief as the Court deems just and appropriate.

Dated: November 4, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      cobb@lrclaw.com
      mcguire@lrclaw.com
      robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: wheelers@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com

*Counsel for Plaintiffs*