## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | Adv. Pro. No. 24-50186 (JTD) |
| -against- | |
| RYAN SALAME, | |
| Defendant. | |

### PLAINTIFFS' BRIEF IN SUPPORT OF
### MOTION TO ENFORCE THE TEMPORARY RESTRAINING ORDER

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT...................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

    A.    The Court Entered a Temporary Restraining Order, Prohibiting Salame from Dissipating Any Assets Without Court Approval.....................................................2

    B.    The Debtors Serve Expedited Discovery. ..................................................................4

    C.    Salame Purports to Consent to a Preliminary Injunction in a Ploy to Avoid His Wife and Their Law Firms Providing Discovery to the Debtors. ....................5

    D.    The Expedited Discovery that Plaintiffs Have Received To Date Reveals that Salame or his Agents Dissipated Debtor Assets *Even After the Court Requested that he Agree to a Temporary Restraining Order*.................................6

    E.    Expedited Discovery Confirms that Salame Dissipated Millions of Dollars of Debtor Assets on Luxury Vacations, Legal Retainers for Him and His Wife, and Other Personal Expenses. .......................................................................8

LEGAL STANDARD ..............................................................................................................14

ARGUMENT .........................................................................................................................14

CONCLUSION.......................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews* v. *Holloway*,
    1995 WL 875883 (D.N.J. Nov. 9, 1995) ...............................................................................14

*Cal. Dep't of Social Servs.* v. *Leavitt*,
    523 F.3d 1025 (9th Cir. 2008) ............................................................................................14

*Cordius Tr.* v. *Kummerfeld Assocs., Inc.*,
    658 F. Supp. 2d 512 (S.D.N.Y. 2009)................................................................................14

*Damus* v. *Nielsen*,
    328 F.R.D. 1 (D.D.C. 2018)................................................................................................14

*Nat'l Law Ctr. on Homelessness & Poverty* v. *U.S. Dep't of Veterans Affairs*,
    842 F. Supp. 2d 127 (D.D.C. 2012) ...................................................................................14

**Statutes**

11 U.S.C. § 105(a) ....................................................................................................................14

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research LLC ("Alameda LLC"), Alameda Research Ltd. ("Alameda"), North Dimension Inc. ("North Dimension"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services, Inc. ("WRSS") (together, the "Debtors" and "Plaintiffs" in the above-captioned adversary proceeding) hereby submit this brief in support of their motion (the "Motion") to enforce the temporary restraining order entered by the Court on December 17, 2024.  In support of this Motion, Plaintiffs rely upon and incorporate the Declaration of Stephanie G. Wheeler (the "Wheeler Declaration").

## PRELIMINARY STATEMENT

On December 17, 2024, this Court entered a temporary restraining order (the "TRO") enjoining "Salame, his attorneys, agents, assigns, or any other person acting in concert or participation with him . . . from taking any steps to transfer, sell, spend, assign, exchange, convert, dissipate, use, move, or otherwise modify any rights related to any of his assets, without prior Court approval, pending a hearing and determination on the Debtors' [Preliminary Injunction] Motion."  [Adv. D.I. 26.]

In response to third-party subpoenas that the Debtors served on third parties as authorized by this Court's December 13 and 17, 2024 Orders [Adv. D.I. 19, 25], Crypto.com produced transaction records showing that Salame or his agent converted and subsequently withdrew tokens from Salame's Crypto.com account on December 13-14, 2024 – *after* this Court had requested during a December 12, 2024 hearing that Salame consent to a temporary restraining order, *after* Salame refused to consent to a temporary restraining order the morning of December 13, 2024, and *after* the Debtors had filed a motion seeking a temporary restraining order later on December 13, 2024.  Only after withdrawing and moving the crypto beyond the Debtors' and the

Court's reach did Salame consent to a temporary restraining order on December 16, 2024.  Salame or his agent's conduct demonstrates a brazen disregard for the judicial process.

In addition to Salame's or his agent's dissipation of his crypto assets, the four law firms to which Salame transferred Debtor funds to pay retainers or legal fees between July and October 2024 have refused to confirm to the Plaintiffs that they are complying with the TRO and not spending funds received from Salame.  Even more alarming, Salame's wife, Michelle Bond— whom Plaintiffs believe made the withdrawals from Salame's Crypto.com account on December 13-14, 2024 given that Salame is in prison—has also refused to confirm her compliance with the TRO.

Given their serious concerns about violations of the TRO in light of these facts, Plaintiffs seek an order permitting a broader scope of discovery to determine whether Salame, his agents, or attorneys dissipated his assets and/or violated the TRO.  While Plaintiffs believe that they could serve the additional discovery under the Court's existing December 13 and 17 Orders, in an abundance of caution, they seek an order permitting broader discovery to prevent cryptocurrency exchanges, banks, and other third parties from refusing to comply with Plaintiffs' subpoena on the grounds that they do not relate to  account or wallets specifically in Salame's name.

## **STATEMENT OF FACTS**

### A.  **The Court Entered a Temporary Restraining Order, Prohibiting Salame from Dissipating Any Assets Without Court Approval.**

After learning the day they were to sign a settlement agreement with Salame and the day before Salame was to report to prison that Salame had dissipated over $5 million of Debtor assets that he had committed to turn over to the Debtors pursuant to a settlement, on November 4, 2024, the Debtors filed a Complaint against Salame and a motion for a preliminary injunction

seeking to enjoin Salame from further dissipating assets he held ("P.I. Motion") and for expedited discovery. [Adv. D.I. 2]. Also on November 4, the Debtors emailed Salame's then-counsel, Mayer Brown LLP ("Mayer Brown"), to ask if they would accept service of the Complaint and the P.I. Motion on Salame's behalf. (Wheeler Decl. ¶ 3 & Ex. 1.) Mayer Brown informed the Debtors that they were not representing Salame in this action and that Salame would be retaining new counsel. (*Id.*) On December 4, 2024, Montgomery McCracken Walker & Rhoads LLP ("Montgomery McCracken") informed the Debtors that they had been retained by Salame to represent him in this action. (Wheeler Decl. ¶ 4 & Ex. 2.)

On December 12, 2024, the Court held a status conference to discuss the briefing schedule for the Debtors' P.I. Motion and for expedited discovery. [Adv. D.I. 18]. During that hearing, the Court asked whether Salame would consent to a temporary restraining order pending the Court's determination of the Debtors' P.I. Motion. (Wheeler Decl. Ex. 3 (Hr'g Tr.) at 177:1-3.) After Salame's counsel responded that they would need to consult with their client (*id.* at 177:4-7; 178:22-25), the Court requested that Salame inform the Court by 10:00 a.m. on December 13, 2024 whether he would consent to a temporary restraining order (*id.* at 179:2-9). The Court stated that if Salame did not consent to a temporary restraining order it would be a "big red flag." (*Id.* at 178:17-19.) The Court also stated that if Salame would not consent to a temporary restraining order, the Court would enter the Debtors' briefing schedule on the P.I. Motion (*id.* at 178:13-21), which required Salame's opposition to be filed by December 20, 2024, and permitted Plaintiffs to serve expedited discovery into Salame's asset dissipation on third parties and require responses to the Subpoenas within ten days. [Adv. D.I. 13-1]

On the morning of Friday, December 13, 2024, Salame's counsel informed the Court by email that Salame would not consent to a temporary restraining order pending the

preliminary injunction.  (Wheeler Decl. ¶ 7 & Ex. 4.)  On December 13, 2024, the Court therefore entered an order that required Salame's opposition to the P.I. Motion to be filed by December 20, 2024 and permitted the Debtors to serve expedited discovery (the "December 13 Order").  [Adv. D.I. 19].

Later on December 13, 2024, Plaintiffs filed a motion seeking a temporary restraining order enjoining Salame from further dissipating assets pending the Court's determination of the P.I. Motion.  [Adv. D.I. 20].  On Saturday, December 14, 2024, the Court informed the Parties by email that it had set a Zoom hearing on the Debtors' motion for a temporary restraining order for Tuesday, December 17, 2024, at 9:00 a.m.  (Wheeler Decl. ¶ 10 & Ex. 5.)

On Monday, December 16, 2024, Salame informed the Debtors that he would consent to a temporary restraining order.  (Wheeler Decl. ¶ 11 & Ex. 5.)  On December 17, 2024, the Court entered an order (the "TRO") enjoining "Salame, his attorneys, agents, assigns, or any other person acting in concert or participation with him . . .  from taking any steps to transfer, sell, spend, assign, exchange, convert, dissipate, use, move, or otherwise modify any rights related to any of his assets, without prior Court approval, pending a hearing and determination on the Debtors' P.I. Motion."  [Adv. D.I. 26].  Also on December 17, 2024, the Court entered a second order extending Salame's time to file his opposition to the Debtors' P.I. Motion from December 20, 2024 to January 31, 2025 and permitting the Debtors to serve expedited discovery (the "December 17 Order").  [Adv. D.I. 25].

**B.  The Debtors Serve Expedited Discovery.**

As permitted by the December 13 and 17 Orders, between December 16 and December 18, 2024, the Debtors served 28 third-party subpoenas ("Subpoenas") on, among others, Salame's banks, credit card companies, cryptocurrency exchanges, and law firms representing Salame and his now wife Michelle Bond, seeking information concerning his post-petition assets

and his dissipation thereof.  (Wheeler Declaration ¶ 14 (citing [Adv. D.I. 23, 27-28, 30-31, 33]).)

Consistent with paragraph 3 of the December 13 and 17 Orders (which required responses to the

Subpoenas within ten days), the return date on all but one of the Subpoenas was December 30,

2024.  (*Id.*)

### C. Salame Purports to Consent to a Preliminary Injunction in a Ploy to Avoid His Wife and Their Law Firms Providing Discovery to the Debtors.

On December 30, 2024—the day responses to the Subpoenas were due—Salame's

counsel informed the Debtors during a videoconference that Salame would consent to a

preliminary injunction.  (Wheeler Decl. ¶ 15.)  In an email shortly after that videoconference,

however, Salame's counsel stated that:  "the subpoenas go to dissipation of assets and since we are

agreeing to no dissipation of assets[,] the subpoenas are not necessary and would not need to be

responded to."  (Wheeler Decl. ¶ 16 & Ex. 7.)

Hours after receiving the December 30 email from Salame's counsel, the Debtors

received objections to the Subpoena from (i) Montgomery McCracken, Schlam Stone & Dolan

LLP, and Schaerr Jaffe LLP, the three law firms that currently represent Salame in various matters;

(ii) Duane Morris, which represents Bond in her pending criminal case; and (iii) Bond.  (Wheeler

Decl. ¶ 17 & Exs. 8-12.)  Like the email the Debtors had received from Salame's counsel only

hours earlier, in sum and substance, the law firms' and Bond's objections to the Subpoenas asserted

that because Salame had consented to the preliminary injunction, and because the Debtors'

expedited discovery was issued in connection with the P.I. Motion, the law firms and Bond need

not respond to the Subpoenas.  (Wheeler Decl. ¶ 17 & Exs. 8-12.)[2]

---

[2]    Plaintiffs do not agree and reserve all rights with respect to the interposed objections, including to move to compel compliance with this Court's December 17 Order.

On December 31, 2024, the Debtors sent Salame's counsel a proposed revised preliminary injunction order for their review and comment.  (Wheeler Decl. ¶ 24 & Ex. 13.)  Although almost three weeks have passed since the Debtors sent Salame's counsel the draft preliminary injunction order, the Debtors have not received any comments from Salame's counsel on the preliminary injunction order, and no preliminary injunction has been entered.  (Wheeler Decl. ¶ 24.)

**D. The Expedited Discovery that Plaintiffs Have Received To Date Reveals that Salame or his Agents Dissipated Debtor Assets *Even After the Court Requested that he Agree to a Temporary Restraining Order*.**

The expedited discovery the Plaintiffs have received to date reveals that Salame declined the Court's December 12, 2024 request to consent to a temporary restraining order to allow him and his agents additional time to dissipate assets before agreeing to a temporary restraining order that he knew the Court intended to enter.  As the Court correctly predicted during the December 12, 2024 hearing, expedited discovery has confirmed that Salame's refusal to consent to a temporary restraining order was indeed a "big red flag."  (*See* Wheeler Decl. Ex. 3 at 178:17-19.)

Transaction records produced by Crypto.com show ████████████████ Salame—or more likely his wife and agent Bond, given that Salame is in prison serving his 7.5 year sentence—████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

While Plaintiffs believe that they could serve subpoenas on ████████████

████████████████████████ under the Court's existing December 13 Order, in an

abundance of caution—because ███████████████████████████████

█████████████████—Plaintiffs seek an order permitting a broader scope of discovery related to

the dissipation and secreting of assets by Salame, his agents, or attorneys, or violations by them of

the TRO.  The broader scope of discovery will prevent exchanges, banks, and other third parties

from refusing to comply with a subpoena on the grounds that it does not relate to an account or

wallet specifically in Salame's name.

Given that the other cryptocurrency exchanges where Salame disclosed he had

accounts and/or wallets that the Debtors subpoenaed are overseas, Plaintiffs have not yet received

discovery from them showing Salame's transactions, and whether he or his agents similarly

withdrew funds from those wallets or accounts shortly before or after the TRO was issued, as he

did with ███████████████████████████████████████████████

███████████████████████████ it is likely that additional discovery will reveal

additional dissipation and secreting of assets by Salame and/or Bond.

In addition to Salame's and Bond's dissipation of assets held by Salame, the

Plaintiffs also have serious concerns as to whether the four law firms currently representing Salame

and/or Bond are complying with the TRO.  Wire transfer records produced by Truist Financial

Corp. ("Truist") confirmed that all of the law firms currently representing Salame and/or Bond had

received retainers or other legal fees from Salame's Truist bank accounts (*see infra* p. 12), which

contained the sale proceeds from Salame's sales of real estate he owned in Massachusetts and

Texas, that were purchased using Debtor funds.  (Wheeler Decl. ¶ 28 & Ex. 17.)  Because the funds

used to pay the retainers and legal fees originated from the Debtors, on January 10, 2025, Plaintiffs

sent letters to Montgomery McCracken, Schaerr Jaffe, and Schlam Stone (which are representing

Salame) and to Duane Morris (which is representing Bond in her criminal case) enclosing a copy

of the TRO and requesting that they "confirm, in writing, that [the firm] is complying with the

TRO and will not spend, use or otherwise dissipate any retainer or other legal fees received directly

or indirectly from Salame in connection with [its] representation of [Salame or Bond], without

prior Court authorization."  (Wheeler Decl. ¶ 33 & Ex. 22.)  Also on January 10, 2025, Plaintiffs

sent a similar letter to Bond enclosing the TRO and requesting that she "confirm, in writing, that

[she] is complying with the TRO and will not spend, use or otherwise dissipate money in any of

Mr. Salame's accounts, whether held individually or jointly, without prior Court authorization."

(Wheeler Decl. ¶ 34 & Ex. 23.)  To date, Plaintiffs have not received any confirmation (written or

otherwise) from any of Montgomery McCracken, Schaerr Jaffe, Schlam Stone, Duane Morris, or

Bond that they are in fact complying with the TRO and are not spending any funds received from

Salame (or in Bond's case, any funds provided by Salame).  (Wheeler Decl. ¶ 35.)  As officers of

the court, the law firms' refusal to confirm their compliance with this Court's TRO is concerning

indeed.

### E. Expedited Discovery Confirms that Salame Dissipated Millions of Dollars of Debtor Assets on Luxury Vacations, Legal Retainers for Him and His Wife, and Other Personal Expenses.

Salame's brazen conduct ███████████████ after refusing the Court's request

that he consent to a temporary restraining order is unfortunately entirely consistent with his

intentional dissipation of over $5 million of Debtor assets that he had promised to return to the

Debtors pursuant to a settlement, which is the subject of the Debtors' pending P.I. Motion.

Expedited discovery has confirmed that Salame squandered Debtor assets in 2024 to finance an extravagant lifestyle for him and Bond—treating Debtor assets as if they were his personal piggy bank.  Remarkably, Salame continued to dissipate Debtor assets in 2024 on the very same items on which Judge Kaplan, Salame's sentencing judge in the Southern District of New York, admonished Salame for spending the $5 million that he withdrew from the FTX exchange right before its collapse, i.e., on "hiring a public relations firm, paying off personal obligations, and the like.  It was me first, I'm getting in the life boat first, the heck with all those customers."  (Adv. D.I. 4 Ex. 7 at 22:13-17.)

Wire transfer records produced by Truist ██████████████████ ████████ confirm that in 2024 ███████████████████████████████ ████████████████████████████████████████████████████

███████

| Date | Sale Proceeds Deposited | Property Address | Salame Bank Account Deposited Into |
|---|---|---|---|
| 2/5/2024 | $581,393.68 | 80 Church St., Lenox (MA) | Truist -5364 |
| 2/7/2024 | $147,816.00 | 47 Stockbridge Rd., W. Stockbridge (MA) | Truist -5364 |
| 3/8/2024 | $258,665.00 | 6 Tucker St., Lenox (MA) | Truist -5364 |
| 5/2/2024 | $178,658.56 | 27 Housatonic St. Lenox (MA) | Truist -5364 |
| 5/2/2024 | $164,709.46 | 29 Church St., Lenox (MA) | Truist -5364 |
| 5/14/2024 | $558,296.85 | 9 Franklin St. Lenox (MA) | Truist -5364 |
| 6/24/2024 | $326,928.00 | 53 Rood Hill Rd., Sandisfield (MA) | Truist -5364 |

(Wheeler Decl. ¶¶ 26-27 & Exs. 15 & 16 [CONFIDENTIAL].)   Rather than escrowing the proceeds of those real estate sales, however, discovery confirms that Salame spent this $██ million on all manner of personal expenses, as demonstrated below.

<u>Luxury Vacations</u>

   Prior to him reporting to prison on October 11, 2024, Salame, Bond, and Bond's children took more extravagant vacations in the first nine months of 2024 than most people take in a lifetime, all of which he charged to his Apple credit card and paid for with Debtor assets from his Truist account.  Just a few of the many examples include:





Law Firm Retainers and Fees

Despite the law firms' unjustified refusal to respond to the Debtors' Subpoenas, Plaintiffs have nonetheless confirmed from wire transfer records produced by Truist that Salame paid more than $2 million in law firm retainers and legal fees for himself and Bond between July 2024 and October 10, 2024 from his Truist account, which contained the proceeds of sale of the real estate he purchased with Debtor funds. The legal fees that Salame paid from his Truist account containing Debtor funds included:

- $250,000 to Schaerr Jaffe on July 11, 2024, a firm that filed a motion seeking to withdraw Salame's guilty plea in August 2024. (Wheeler Decl. ¶ 28 & Ex. 17 at 10.)

- $1,000,000 to Duane Morris on August 27, 2024 to pay a retainer for "Michelle Bond Suttro." (*Id.*) Duane Morris filed a notice of appearance in Bond's criminal case the same day. (Wheeler Decl. ¶ 28 & Ex. 17 at 13.)

- $100,000 to Schlam Stone & Dolan on September 24, 2024 for "legal expenses." (Wheeler Decl. ¶ 28 & Ex. 17 at 16.)

- Another $68,333 to Duane Morris on October 8, 2024 for Bond's legal fees— three days before he reported to prison. (Wheeler Decl. ¶ 28 & Ex. 17 at 1.)

- Another $150,000 to Schaffer Jaffe on October 8, 2024 (Wheeler Decl. ¶ 28 & Ex. 17 at 19), purportedly for the purpose of seeking a pardon for Salame.[3]

---

[3]   On October 8, 2024, Mayer Brown, Salame's then counsel, informed the Debtors that the balance of Salame's Truist account would be "further diminished" by retainers for, among others, "pardon counsel." [Adv. D.I. 4 ¶ 60 (citing Adv. D.I. 4 Ex. 11 at 1).] The biography for Salame's lawyer at Schaerr Jaffe, Christopher Bartolomucci, states that he has "has helped three clients obtain full and unconditional pardons from the President of the United States." *H. Christopher Bartolomucci*, SCHAERR JAFFE, https://www.schaerr-jaffe.com/attorneys/h-christopher-bartolomucci/ (last visited Jan. 13, 2025).

- $400,000 to Mayer Brown, Salame's former counsel, on October 10, 2024, the day the Debtors were supposed to sign the settlement agreement with Salame and the day before Salame reported to prison. (Wheeler Decl. ¶ 28 & Ex. 17 at 4.)

- Another $100,000 to Duane Morris on October 10, 2024 for Bond's legal fees. (Wheeler Decl. ¶ 28 & Ex. 17 at 7.)

All of the retainers and fees paid to these law firms were from Debtor funds.

In addition, after the Debtors sued Salame and filed their P.I. Motion on November 4, 2024, Mayer Brown informed the Debtors that they were not representing Salame in this action and that Salame would be retaining new counsel. (Wheeler Decl. ¶ 3 & Ex. 1.) On December 4, 2024, the Debtors were informed by email that Salame had retained Montgomery McCracken to represent him in this action. (Wheeler Decl. ¶ 4 & Ex. 2.) ██████ records produced by Mayer Brown ██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████ On October 10, 2024, Mayer Brown had informed the Debtors that Salame's Truist account contained the proceeds of the sales of Salame's Lenox and Texas properties. (Adv. D.I. 4 ¶ 64.)

After receiving the Truist wire transfer records confirming that Salame's and Bond's lawyers had all been paid from Salame's Truist account (Wheeler Decl. ¶ 28 & Ex. 17), on January 10, 2024, Plaintiffs sent letters to Montgomery McCracken, Schaerr Jaffe, and Schlam Stone—the law firms representing Salame, and Duane Morris—the law firm representing Bond, enclosing a copy of the TRO (for all but Montgomery McCracken) and requesting that they "confirm, in writing, that [the firm] is complying with the TRO and will not spend, use or otherwise

dissipate any retainer or other legal fees received directly or indirectly from Salame in connection with [its] representation of [Salame or Bond], without prior Court authorization." (Wheeler Decl. ¶ 33 & Ex. 22.)  To date, Plaintiffs have not received any confirmation (written or otherwise) from any of the law firms or Bond that they are complying with the TRO and not spending any funds received from Salame.  (Wheeler Decl. ¶ 35.)

<u>Other Expenses</u>

Between January 2024 and October 2024, Salame made substantial outgoing wire payments from his Truist account and incurred more than $███ in charges to his Apple Card and over $███ in charges to his Citibank card, both of which were paid from his Truist account. (Wheeler Decl. Ex. 20.)  (Plaintiffs have not yet received from American Express Salame's monthly credit card statements.)  Some examples of the more outrageous items that Salame purchased using his Truist account ██████████████████████████████ and paid with Debtor funds include:

- $90,000.00 to Private Medical New York P.C., a concierge medical practice in New York City (Wheeler Decl. Ex. 21 at 13);

- Over $100,000.00 to M Group Strategic Communications, which is a public relations firm (Wheeler Decl. Ex. 21 at 1, 10);

- $100,000.00 to Bond's ex-husband, Dan Bond, on October 10, 2024, which appears to be some sort of payment in connection with her divorce settlement, which was finalized on September 9, 2024 (Wheeler Decl. Ex. 21 at 4);

- Over $70,000.00 to Godaddy.com, an internet domain name registry and web hosting company (Wheeler Decl. Ex. 21 at 7);



**LEGAL STANDARD**

This Court has jurisdiction to enforce the terms of its TRO [Adv. D.I. 26 at 2]. This Court also has "broad discretion to fashion remedies as equity requires, to ensure compliance with [its] orders." *Cordius Tr.* v. *Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 524 (S.D.N.Y. 2009); *see Nat'l Law Ctr. on Homelessness & Poverty* v. *U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012) ("[W]hen it comes to a court's enforcement and monitoring of its *own orders*, the court is the judge and jury." (emphasis in original)); *Andrews* v. *Holloway*, 1995 WL 875883, at *18 (D.N.J. Nov. 9, 1995) ("These Defendants shall be subject to reasonable assets discovery during pendency of this litigation as relevant to issues of [ ] compliance with this Order and previous Temporary Restraining Orders herein . . . ."). "The Court has the relevant authority 'as part of its inherent power to enforce its judgments,' and it is clear that 'appropriate discovery should be granted' where 'significant questions regarding noncompliance [with a court order] have been raised.'" *Damus* v. *Nielsen*, 328 F.R.D. 1, 3 (D.D.C. 2018) (quoting *Cal. Dep't of Social Servs.* v. *Leavitt*, 523 F.3d 1025, 1033-34 (9th Cir. 2008)); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

**ARGUMENT**

Through the expedited discovery received to date, Plaintiffs have established that there are "significant questions" regarding Salame's, his agent's and attorneys' compliance with the TRO. *See Damus*, 328 F.R.D. at 3 (quoting *Leavitt*, 523 F.3d at 1033-34). Although Plaintiffs believe that they could serve the additional discovery they seek under the Court's existing December 13 Order, in an abundance of caution, Plaintiffs seek permission to serve broader discovery related to the dissipation of assets by Salame, his agents, or attorneys, or violations by

-14-

them of the TRO.  Plaintiffs require additional discovery to determine whether Salame, his agents or attorneys have violated the TRO.

Salame and his agents have demonstrated their willingness to dissipate assets even after the Court requested that he agree to a temporary restraining and after the Debtors had filed a motion for a temporary restraining order.  On December 12, 2024, the Court had requested that Salame agree to a temporary restraining order, and he declined to do so on the morning of December 13, 2024, which the Court correctly noted was a "big red flag."  (Wheeler Decl. Ex. 3 at 178:13-19.)  Expedited discovery has now revealed the reason that Salame declined to consent to the temporary restraining order:  namely, Salame and his agents needed more time to dissipate his additional assets before they were enjoined from doing so.  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  Having successfully secreted these assets from the Court's and the Debtors' reach, on Monday, December 16, 2024, Salame then consented to the very TRO that he had refused to agree to on Friday, December 13, 2024.  The Court cannot countenance Salame's outrageous stunt, which demonstrates a blatant disregard for the judicial process.

Plaintiffs request leave to serve broader discovery relating to the dissipation of assets held by Salame and violations of the TRO.  For example, Plaintiffs want to serve a subpoena relating to ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Similarly, Plaintiffs also want to subpoena ███████████ relating to ████████████ ████████████████. Again, Plaintiffs do not know whether ████████████ ████████████████. Salame never disclosed having a ███████████ wallet to the DOJ or to the Debtors. By requesting a broader scope of discovery than is provided in the December 13 and 17 Orders, Plaintiffs seek to ensure that ████████████, and others do not take the position that they need not provide information in response to a Debtor subpoena because a wallet or account is not in Salame's name. The TRO is broader than Salame and covers his agents, such as Bond.

Additionally, because the Subpoenas that the Debtors previously served on banks and credit card companies had a return date of December 30, 2024 (given the original expedited briefing schedule on the P.I. Motion), Plaintiffs did not receive bank statements or credit card statements for Salame's accounts for the month of December 2024 and therefore are unable to determine whether any of the assets held by Salame were dissipated after the TRO was entered on December 17, 2024. Plaintiffs therefore intend to serve additional subpoenas seeking Salame's account statements and wire transfer records for December 2024 and January 2025.

Moreover, given Bond's suspected involvement ████████████████████ ████████████████, Plaintiffs would like to serve subpoenas for her bank statements, wire transfer records, and exchange accounts and wallets to ensure she is complying with the TRO. Plaintiffs also intend to take her deposition concerning possible asset dissipation or violations of the TRO.

Finally, it is a "big red flag" that not a single one of the law firms representing Salame or Bond—or indeed Bond herself—has responded to the January 2025 letters Plaintiffs sent asking them to confirm that they are actually complying with the TRO and are not spending

any funds received from Salame in violation of the TRO.  Plaintiffs intend to meet and confer with the law firms and Bond about their non-compliance with the Subpoenas (which is improperly premised on Salame's alleged consent to a P.I. Order that has not been entered) and file a motion to compel with the Court if they refuse to comply.

## **CONCLUSION**

For all the above reasons, the Court should enter the Proposed Order attached as **Exhibit 1** to the Motion, granting Plaintiffs authorization to serve discovery concerning whether Salame, his agents, and his attorneys have dissipated his assets and/or violated the TRO, and granting such further relief as the Court deems just and appropriate.

Dated: January 22, 2025
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: wheelers@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       crokej@sullcrom.com

*Counsel for Plaintiffs*