IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC.,<br><br>        Plaintiffs,<br><br>        -against-<br><br>RYAN SALAME,<br><br>        Defendant. | Adv. Pro. No. 24-50186 (JTD) |

**PLAINTIFFS' OPPOSITION TO REQUEST FOR EXTENSION OF TIME
AND RESPONSE OF MICHELLE BOND TO
DEBTORS' MOTION FOR A PRELIMINARY INJUNCTION**

        Plaintiffs FTX Trading Ltd., Alameda Research LLC, Alameda Research Ltd., North Dimension Inc., West Realm Shires, Inc., and West Realm Shires Services, Inc. (collectively, the "Debtors" or "Plaintiffs") hereby submit this Opposition to *Request for Extension of Time and Response of Michelle Bond to Debtors' Motion for a Preliminary Injunction* [Adv. D.I. 59] (the "Request"). In support of the Opposition, Plaintiffs rely on and incorporate the Declaration of

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the FTX Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the FTX Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Stephanie G. Wheeler (the "Wheeler Declaration"), filed contemporaneously herewith, and state as follows:

**PRELIMINARY STATEMENT**

1. Bond's Request is just another in a series of motions designed to delay the Court's decision on the Debtors' Motion for a Preliminary Injunction ("PI Motion" [Adv. D.I. 2]), which has been pending for three months now. After Salame's counsel, Montgomery McCracken Walker & Rhoads LLP ("MMWR"), failed in its attempt to delay the Court's decision on the PI Motion by attempting to withdraw and stay the action—and after the Court required Salame substantively to respond to the PI Motion on January 31, 2025 as originally ordered (which Salame did not do [Adv. D.I. 58])—his wife Michelle Bond, a non-party to this adversary proceeding, filed this frivolous motion at the eleventh hour—on the day Salame's response to the PI Motion was due—seeking to extend her time to respond to the PI Motion.

2. The Court should not grant Bond's Request for an extension of time to respond to the PI Motion, because Bond is not a party to the adversary proceeding and has not moved to intervene in the adversary proceeding. *See In re Thompson*, 965 F.2d 1136, 1141 (1st Cir. 1992) ("[N]onparty participation in an adversary proceeding is dependent on intervention.") (*citing In re Latimer*, 918 F.2d 136, 137 (10th Cir. 1990)).

3. Even if the Court were to consider Bond's Request, she has offered no reason for waiting until January 31, 2025—the day Salame's response to the PI Motion was due and almost three months after the PI Motion was originally filed—to request an extension of time to respond to the PI Motion. In fact, Bond has been on actual notice of the PI Motion since at least November 11, 2024, when she caused her criminal lawyers at Duane Morris LLP ("Duane Morris") to contact MMWR to seek to retain them on behalf of Salame in connection with this adversary proceeding. [Adv. D.I. 48 ¶ 1.] On November 4, 2024, Plaintiffs served courtesy

copies of the Complaint and PI Motion on Mayer Brown LLP ("Mayer Brown") [Adv. D.I. 47 Ex. 1], who had been representing Salame and who had, until August 2024, also represented Bond.  Mayer Brown clearly forwarded Plaintiffs' papers to Bond, given that Bond notified her criminal lawyers at Duane Morris to contact MMWR no later than November 11, 2024 and Salame, who was incarcerated at the time, had not yet been personally delivered a copy of the summons and the PI Motion papers.  [Adv. D.I. 9 ¶ 6 ; Adv. D.I. 48 ¶ 1.]

4. In addition, Bond and her criminal counsel at Duane Morris each received a letter from Plaintiffs on January 10, 2025 ("January 10 Letters") requesting confirmation that they were complying with the TRO and not spending any funds received directly or indirectly from Salame.  [Adv. D.I. 47 Exs. 22, 23.]  Neither Bond nor Duane Morris responded to the January 10 Letters or disputed the Plaintiffs' interpretation of the TRO prior to Plaintiffs filing the Motion to Enforce the TRO on January 22, 2025 [Adv. D.I. 42], and neither has offered any explanation for waiting three weeks after receiving those letters to seek an extension of time to respond to the PI Motion.

5. Bond's claims that the TRO is causing her "significant and material harm" [Adv. D.I. 59] entirely ignores the fact that Bond was not only aware of—but also as Salame's "attorney-in-fact" [Adv. D.I. 58], was involved in—Salame's decision to consent to the TRO that the Court entered on December 17, 2024, [Adv. D.I. 26.]  Indeed, given the purported difficulty in communicating with Salame in prison cited by his counsel and the fact that Salame consented to the TRO only one business day after Plaintiffs moved for a TRO, it is highly likely that Bond, in her capacity as "attorney-in-fact" for Salame [Adv. D.I. 58], made the decision for Salame to consent to the TRO.  MMWR has stated that "MMWR's principal manner of communicating with Mr. Salame had been through direct and frequent communications with and from Ms. Bond" and

that Salame himself is "basically unreachable in any meaningful sense by MMWR." [Adv. D.I. 48 ¶ 8(c)-(d).]

6. Before consenting to the TRO, however, Bond surreptitiously dissipated Salame's assets [Adv. D.I. 46 at 5], and secreted them away from the Court's and the Plaintiffs' reach. Bond dissipated Salame's assets even *after* the Court had asked Salame to consent to the TRO on December 12, 2024, *after* Salame (more likely, Bond acting as his "attorney-in-fact") had refused to consent to the TRO on the morning of December 13, 2024, and *after* the Plaintiffs subsequently moved for a TRO on December 13, 2024. [Adv. D.I. 47 ¶ 25 & Ex. 14.] Thus, Bond's statement, unsupported by any declaration, that she "ha[s] complied with the terms of the TRO" [Adv. D.I. 59 ¶ 11] rings hollow, and her attempt to portray herself as the victim here is contradicted by the undisputed evidence and the statements of Salame's counsel.

7. In addition, Bond's claim that the "TRO deprives Ms. Bond of any ability to satisfy everyday living expenses and the ability to effectively care for her family" is not credible for several reasons. [*See* Adv. D.I. 59 ¶ 14.] First, Bond, as attorney-in-fact for Salame, likely consented to the TRO. Second, prior to the entry of the TRO, MMWR informed the Plaintiffs during a December 13, 2024 telephone conversation that Bond has a consulting arrangement that allows her to pay her bills every month. (Wheeler Decl. ¶ 2.) Third, although the TRO (and the proposed PI Order) provide that applications can be made to the Court to seek to spend funds enjoined by the TRO, none of Salame, Bond, or Duane Morris has ever made such an application with the Court.

8. As detailed in the PI Motion and the Motion to Enforce the TRO, Bond's "current predicament" [Adv. D.I. 59 ¶ 15] is the result of Salame and Bond having recklessly and

brazenly dissipated millions of dollars of Debtor assets, which is what necessitated the PI Motion and the TRO Motion in the first place.

## FACTUAL BACKGROUND

**A. Bond Was on Actual Notice of Plaintiffs' PI Motion Since at Least November 11, 2024**

9. After learning on the day the Debtors were to sign a settlement agreement with Salame—and the day before Salame was to report to prison to serve his 7.5 year sentence—that Salame had spent more than $5 million of funds that he was supposed to turn over to the Debtors pursuant to a settlement, Plaintiffs filed a Complaint and the PI Motion against Salame on November 4, 2024. [Adv. D.I. 1, 2.]

10. On November 4, 2024, Plaintiffs sent by email courtesy copies of the Complaint and PI Motion to Mayer Brown, who had been representing Salame in his settlement negotiations with the Debtors and had until August 2024 also represented Bond, and asked if Mayer Brown would accept service of the Complaint and PI Motion on Salame's behalf. [Adv. D.I. 47 Ex. 1 at 2.]

11. Although Mayer Brown responded that it was no longer representing Salame, Mayer Brown apparently forwarded the Complaint and PI Motion to Bond. On or about November 11, 2024—prior to the Plaintiffs effecting service of the papers on Salame in prison on November 15, 2024—Bond caused her criminal counsel at Duane Morris to ask MMWR to represent Salame in this adversary proceeding. [Adv. D.I. 9 ¶ 6; Adv. D.I. 48 ¶ 1.] Thus, Bond's assertions that "no service [of the Complaint and PI Motion] was made on her undersigned counsel, Duane Morris" [Adv. D.I. 59 ¶ 5], is both disingenuous and irrelevant since Duane Morris had actual knowledge of the Complaint and PI Motion.

12. MMWR has also represented to this Court that virtually all of its communications with Salame in this adversary proceeding went through Bond. [Adv. D.I. 48 ¶ 8(c)-(d).] Indeed, MMWR has now confirmed what Plaintiffs have always suspected: that Bond is acting as "attorney-in-fact" for Salame in this adversary proceeding. [Adv. D.I. 57 n.1.][2]

**B. Bond, As Salame's "Attorney-in-Fact," Consents to the TRO**

13. During a December 12, 2024 hearing to set a briefing schedule on the PI Motion, the Court asked if Salame would consent to a TRO pending the Court's decision on the PI Motion. [Adv. D.I. 47 Ex. 3 (Hr'g Tr.) at 177:1-3.] The Court required a response from Salame by 10:00 a.m. on December 13, 2024. [*Id.* at 179:2-9.] Given the purported difficulty of communicating with Salame in prison on that short timeframe and the fact that Bond is "attorney-in-fact" for Salame, it was most likely Bond who decided that Salame would decline the Court's request to consent to the TRO.

14. Now we know why. Bond dissipated Salame's assets *after* the Court had asked Salame to consent to a TRO on December 12, 2024, *after* Salame had declined to consent to a TRO on the morning of December 13, 2024, and *after* Plaintiffs moved for a TRO later on December 13, 2024. [Adv. D.I. 47 ¶¶ 6, 7, 9, 11, 25 & Exs. 3, 14.]

15. After Bond had successfully secreted Salame's assets beyond the reach of the Court and Plaintiffs, Salame, or more likely Bond as his "attorney-in-fact"—facing a hearing on the TRO Motion on December 17, 2024 and a response to the PI Motion due on December 20,

---

[2] Although Plaintiffs' subpoena to Bond served on December 16, 2024 requested copies of any power of attorney that authorized Bond to act on Salame's behalf, Bond objected, in part, to responding to the subpoena on the grounds that Salame had consented to entry of a preliminary injunction. [Adv. D.I. 47 Ex. 12.] MMWR has now confirmed that Bond was authorized to act as "attorney-in-fact" for Salame in this adversary proceeding. [Adv. D.I. 58]. Plaintiffs still have not received a copy of the actual power of attorney.

2024—consented to the TRO on December 16, 2024, which the Court entered on December 17, 2024. [Adv. D.I. 47 Ex. 6; Adv. D.I. 26.]

16. Thus, Bond's statement that she "ha[s] complied with the terms of the TRO," [Adv. D.I. 59 ¶ 11]—which is unsupported by any declaration and is the subject of Plaintiffs' Motion to Enforce the TRO—is not credible.

17. Furthermore, during a call on December 13, 2024, MMWR told Plaintiffs that Bond has a consulting arrangement that allows her to pay her bills every month. (Wheeler Decl. ¶ 2.)

18. On December 17, 2024, with the TRO in place, the Court also entered an order extending Salame's time to respond to the PI Motion from December 20, 2024 to January 31, 2025. [Adv. D.I. 25.] Thus, Bond, as attorney-in-fact for Salame and the primary person with whom MMWR was communicating regarding the adversary proceeding, has known since at least December 17, 2024 that Salame's response to the PI Motion was due January 31, 2025.

**C. MMWR Told Plaintiffs That Salame Would Consent to a Preliminary Injunction, and Bond and Duane Morris Then Used That Purported Consent to Avoid Providing Expedited Discovery on the PI Motion**

19. As authorized by the Court's December 13 and 17, 2024 Orders, between December 16-18, 2024, Plaintiffs served 28 subpoenas on third parties (the "Subpoenas"), including MMWR, Bond, and Duane Morris, seeking discovery concerning Salame's assets and the dissipation thereof. [Adv. D.I. 23, 27, 28, 30, 31, 33.] Consistent with the expedited discovery ordered by the Court, the return date on the Subpoenas was December 30, 2024.

20. On December 30, 2024—the date the responses to the Subpoenas were due—MMWR informed Plaintiffs that Salame would consent to a preliminary injunction and requested that Plaintiffs send it a revised PI Order. [Adv. D.I. 47 ¶¶ 15-16 & Ex. 7.]

21. Later on December 30, 2024, Plaintiffs received objections to the Subpoenas from MMWR, Bond, and Duane Morris asserting, in sum and substance, that because Salame had consented to the preliminary injunction, they need not respond to the Subpoenas which were issued in connection with the PI Motion. [Adv. D.I. 47 Exs. 7, 8, 11, 12.] Thus, Bond and Duane Morris both knew that Salame had agreed to consent to the PI Motion more than a month ago and used Salame's purported consent to the PI Motion to avoid their discovery obligations.

22. On December 31, 2024, Plaintiffs sent MMWR a revised form of PI Order. [Adv. D.I. 60 ¶ 9.] On January 6, 2025, not having received any comments on or other communications from MMWR about the PI Order, Plaintiffs sent an email to MMWR asking whether they had comments on the PI Order. [Adv. D.I. 60 ¶ 10.] MMWR responded that they were "trying to discuss with our client." [Adv. D.I. 60 ¶ 11.]

23. Concerned that no PI Order had been entered despite Salame's purported consent and given Bond's, MMWR's and Duane Morris' use of Salame's purported consent to a preliminary injunction to avoid expedited discovery—Plaintiffs sent the January 10 Letters to MMWR, Bond, and Duane Morris asking them to confirm that they were complying with the TRO and not spending any funds received from Salame. [Adv. D.I. 47 Exs. 22, 23.] None of them responded to the January 10 Letters, which contributed to Plaintiffs' filing of the Motion to Enforce the TRO on January 22, 2025.[3] Nor did Bond or Duane Morris, prior to Plaintiffs filing

---

[3]   Indeed, Duane Morris only responded to the January 10 Letter a week after Plaintiffs' criticized Duane Morris' failure to respond in its January 22, 2025 Motion to Enforce the TRO [Adv. D.I. 59 Ex. B], but it still has not

the Motion to Enforce the TRO, ever claim to Plaintiffs nor raise with the Court their apparent view that Plaintiffs' interpretation of the TRO was incorrect or that Bond was prejudiced by the TRO.

24. On January 13, 2025, Plaintiffs received discovery from a third-party in response to Plaintiffs' Subpoena showing that Bond had dissipated Salame's assets *after* the Court had asked Salame to consent to a TRO on December 12, 2024, *after* Salame had declined to consent to a TRO on December 13, 2024 and *after* Plaintiffs had filed a motion for a TRO later on December 13, 2024. [Adv. D.I. 47 ¶¶ 6, 7, 9, 11, 25 & Exs. 3, 14.]

25. On January 22, 2024, Plaintiffs filed their Motion to Enforce the TRO, citing the evidence of Bond's continued dissipation of Salame's assets and describing other evidence Plaintiffs had received during expedited discovery of Salame's dissipation of millions of dollars of assets in the first 10 months of 2024. [Adv. D.I. 42.] Plaintiffs do not currently have visibility into the full extent of Bond's dissipation of assets held by Salame.

26. Despite Bond's protestations that Plaintiffs "did not serve the Motion to Enforce on Duane Morris" [Adv. D.I. 59 ¶ 10], Duane Morris had actual notice of the Motion to Enforce the TRO on January 23, 2025, the same day the public version was filed. Indeed, MMWR's motion to withdraw states that "[o]n January 23, 2025, MMWR was directed by Ms. Bond's counsel, the firm of Duane Morris LLP, that it (MMWR) is no longer permitted to contact Ms. Bond." [Adv. D.I. 48 ¶ 8(b).]

**D. Bond's Assertions That the TRO is Preventing Her From Taking Care of Her Family**

27. Bond currently lives in a 5 bedroom, 8 bathroom 13,000 square foot house located on a golf course in Potomac, Maryland. The house has two pools (an indoor and an

---

complied with the December 30, 2024 subpoena Plaintiffs served on it. Bond still has not responded to the January 10 Letter, which is not surprising given her dissipation of Salame assets.

outdoor one), an elevator, a sauna, a gym, a billiards room, an indoor theater, and a three-car garage.[4] Salame purchased the house in June 2022 for $3,995,000 using Debtor funds. (Complaint ¶¶ 112-13.)

28.     As detailed in the PI Motion and the Motion to Enforce the TRO, expedited discovery has confirmed that, after his guilty plea and the imposition of a 7.5 year sentence, Salame and Bond lived an extravagant lifestyle, spending millions of dollars on luxury vacations, and personal expenses, including millions of dollars in legal fees, funded in large part by millions of dollars from the sale of real estate that Salame had purchased with Debtor funds.

29.     Bond's assertion, unsupported by any declaration, that the TRO "deprives Ms. Bond of any ability to satisfy everyday living expenses and the ability to effectively care for her family" [Adv. D.I. 59 ¶ 14], must be viewed through the lens of someone who has been living a lavish lifestyle, including living in a 13,000 square foot home, funded entirely by the Debtors at the expense of the creditors.

**E.  Bond's Assertions About Her Inability to Defend Herself**

30.     Bond's Response conveniently omits the fact that expedited discovery has confirmed that the entirety of the $1.17 million in retainers and legal fees that Duane Morris, her criminal defense counsel, received between August 2024 and October 10, 2024 to represent Bond in her criminal case came from Salame's Truist bank accounts [Adv. D.I. 46 at 11-12 (citing [Adv. D.I. 47 Ex. 17 at 1, 7, 13])], into which he deposited the sale proceeds of the Massachusetts real estate that he had purchased with Debtor funds [Adv. D.I. 46 at 9 (citing [Adv. D.I. 47 Ex. 15])], and are therefore Debtor funds.

---

[4]     Ben Weiss, *Ryan Salame Says He's Guilty and 'Criminally' Innocent – Inside the Puzzling Case of the Imprisoned FTX Exec* (Oct. 19, 2024), https://www.dlnews.com/articles/people-culture/inside-the-puzzling-case-of-imprisoned-ftx-exec-ryan-salame/.

31. The TRO in no way prohibits Bond from paying Duane Morris' fees from her own funds that have not come from Salame (such as funds from family members, which she used to satisfy her bail conditions).

32. Despite the protestations that the TRO deprives "Ms. Bond of a criminal defense needed to protect her personal liberty" [Adv. D.I. 59 ¶ 13], none of Salame, Bond, or Duane Morris has made any application to the Court to permit Duane Morris to spend any of the retainers that are subject to the TRO.

33. No trial date has yet been set in Bond's criminal case and the next status conference in her criminal case is not until June 10, 2025. Oral Order, *United States* v. *Bond*, No. 24-cr-00494 (S.D.N.Y. Jan. 8, 2025).

34. Bond has no right to fund her defense in her criminal case—which involves her receipt of illegal contributions from FTX and Salame to fund her failed congressional campaign—with funds that belong to the Debtors and should rightfully be returned to the creditors.

### ARGUMENT

I. **The Court Should Not Delay Its Decision on the PI Motion—Which Salame Did Not Oppose—To Permit Bond Belatedly To Respond When She Has Been On Notice of the PI Motion for 2.5 Months**

35. The Court should deny Bond's Request for an extension of time to respond to the PI Motion, which is just another transparent effort by Salame, Bond, and their attorneys to delay the entry of a PI Motion. The Court should not countenance Salame's and Bond's repeated gamesmanship and transparent efforts to delay.

36. Despite their attempts to feign ignorance of the PI Motion, which has been pending for three months now, Bond and Duane Morris both had actual notice of the PI Motion

by November 11, 2024, when Bond caused Duane Morris to contact MMRW to request that MMRW represent Salame in this action. Bond, as Salame's attorney-in-fact, then consented to the TRO on December 16, 2024—only after secretly dissipating assets over the weekend—in order to obtain a six-week extension of time to respond to the PI Motion (from December 20, 2024 to January 31, 2025). On December 30, 2024, Salame (likely through his attorney-in-fact Bond) claimed to consent to the PI Motion as a way for Bond, MMWR, and Duane Morris to avoid providing the requested expedited discovery concerning Salame's dissipation of assets, which discovery was due that same day. Bond and Duane Morris refused to respond to Plaintiffs' January 10 Letters asking them to confirm their compliance with the TRO, necessitating Plaintiffs' Motion to Enforce the TRO. Given all of this, Bond cannot now claim that she is prejudiced by the TRO, to which she agreed as Salame's attorney-in-fact, or by the PI Motion, to which she also consented to as Salame's attorney-in-fact and then used such purported consent to avoid her discovery obligations. Nor can Bond claim that she did not know that responses to the PI Motion were due January 31, 2025, given that she was the means of contact between MMWR and Salame and was Salame's attorney-in-fact.

37. Only two days before Bond filed her Request, during a January 29, 2025 hearing, the Court expressed its concerns "about having Mr. Salame unrepresented in this case while he tries to find new counsel" given Salame's "conduct" and "the fact that he's in prison, which can make it difficult for the debtors to be able to communicate with somebody who can find out what is going on, whether he's continuing to dissipate assets, whether he has any assets and so forth." Hr'g Tr. at 12:8-13:2, *FTX Trading Ltd.* v. *Ryan Salame*, Adv. Pro. No. 24-50186 (Bankr. D. Del. Jan. 29, 2025), Adv. D.I. 56. The Court also required Salame to file his response to the PI Motion on January 31, 2025. *Id.* at 12:21-13:2. Despite the Court's clear directive that

Salame was to respond to the PI Motion by January 31, 2025, Salame defied the Court by filing what can only be described as a "non-response" to the PI Motion. [Adv. D.I. 58.] Given that Salame did not oppose the PI Motion, the Court should enter the PI Order and not afford Bond additional time to take a second bite at the apple.

38. Moreover, Plaintiffs have submitted evidence that they have actually been prejudiced during the three months that the PI Motion has been pending. Specifically, Bond herself dissipated Salame's assets and secreted them beyond the reach of the Court and the Plaintiffs. [Adv. D.I. 47 ¶ 25 & Ex. 14.] Moreover, MMWR spent the entirety of the substantial retainer it received without any meaningful work product to show for it. *See Eagle Fruit Traders, LLC* v. *Ultra Fresh, LLC*, 2019 WL 5704503, at *9 (D.N.J. Nov. 4, 2019) (finding Plaintiffs had shown prejudice by Defendants' dissipation of assets which risks "severely hamp[ering] Plaintiff's ability to vindicate its claims" and Defendants' "willful[] fail[ure] to comply with one or more of the Court's orders"). Plaintiffs are seeking additional discovery that will reveal whether other violations of the TRO have taken place.

39. Moreover, Bond and Duane Morris offer no excuse—and indeed, there is none—for waiting three weeks to raise their apparent objection to Plaintiffs' interpretation of the TRO set forth in Plaintiffs' January 10 Letters. Neither Bond nor Duane Morris responded to the January 10 Letters, necessitating Plaintiffs' Motion to Enforce the TRO. If Bond or Duane Morris actually believed that Plaintiffs' interpretation of the TRO was incorrect, they should have promptly raised it with the Plaintiffs and then the Court. Their failure to do should not be the basis for any further delay in deciding the PI Motion.

40. Finally, Bond's assertion that the TRO functions as an improper prejudgment attachment [Adv. D.I. 59 ¶ 16] is incorrect. This Court has previously held that "the

-13-

creditor in a fraudulent transfer action may obtain '[a]n attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law,' which includes '[a]n injunction against further disposition by the debtor or a transferee . . . of the asset transferred or of other property,' as well as '[a]ny other relief the circumstances may require'" under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"). *In re BYJU's Alpha*, 661 B.R. 109, 121 (Bankr. D. Del. 2024) (citing Del. Code Ann. tit. 6, § 1307(a)(2)-(3)).  Here, prejudgment injunctive relief is appropriate, in part, because Plaintiffs have asserted fraudulent transfer claims under DUFTA in the Complaint.  [*See* Adv. D.I. 3 (the "PI Brief") ¶¶ 7, 58-59.]

41.   Bond's argument misses the point.  Plaintiffs have not sought prejudgment attachment, but rather an *injunction* against the further dissipation of assets held by Salame—and conveyed to or controlled by Bond—that belong to Plaintiffs and relate to misconduct that has resulted in Salame being sentenced to 7.5 years in federal prison.

42.   In any event, the cases to which Bond cites to support her contention that a prejudgment attachment is an extraordinary remedy that is inappropriate at this stage of the litigation are readily distinguishable.  *See In re Sabratek Corp.*, 257 B.R. 732, 734-35, 738 (Bankr. D. Del. 2000) (denying prejudgment attachment of a creditor's funds where the Creditors' Committee had not even filed a complaint against the creditor asserting a fraudulent conveyance claim); *Grupo Mexicano De Desarrollo* v. *All. Bond Fund*, 527 U.S. 308, 340 (1999) (Bond cites the dissent for the proposition that "[a] preliminary asset-freeze order . . . would rank and operate as an extraordinary remedy"); *Scaba* v. *JetSmarter, Inc.*, 2019 U.S. Dist. LEXIS 142511, at *16, 18-19 (D.N.J. Aug. 21, 2019) (denying prejudgment attachment where Plaintiffs had not demonstrated a "probability" of obtaining a judgment in their favor because Plaintiffs' arguments

were "mainly based on speculation" and Plaintiffs had "failed to identify property or a specific location to attach the writ").

43. Finally, Bond's request that the Court "establish[] a briefing schedule to resolve the [PI] Motion" ignores the fact that the Court's December 17, 2024 Order already set a briefing schedule for the PI Motion, which required Salame's response to be filed on January 31, 2025. [Adv. D.I. 25.] In fact, the December 17, 2024 Order extended the Court's prior briefing schedule, which had required Salame's response to be filed on December 20, 2024 [Adv. D.I. 19], and followed a hearing before this Court on December 12, 2024 where these scheduling and other matters were discussed. Bond has provided no justification for any further extension of the briefing schedule on the PI Motion.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Bond's Request for an extension of time to respond to the PI Motion.

| | |
|---|---|
| Dated: February 4, 2025<br>Wilmington, Delaware | **LANDIS RATH & COBB LLP**<br><br>*/s/ Matthew B. McGuire*<br>Adam G. Landis (No. 3407)<br>Richard S. Cobb (No. 3157)<br>Matthew B. McGuire (No. 4366)<br>Howard W. Robertson IV (No. 6903)<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801<br>Telephone: (302) 467-4400<br>Facsimile: (302) 467-4450<br>E-mail: landis@lrclaw.com<br>         cobb@lrclaw.com<br>         mcguire@lrclaw.com<br>         robertson@lrclaw.com<br><br>-and-<br><br>**SULLIVAN & CROMWELL LLP**<br>Stephanie G. Wheeler (admitted *pro hac vice*)<br>Brian D. Glueckstein (admitted *pro hac vice*)<br>Christopher J. Dunne (admitted *pro hac vice*)<br>Jacob M. Croke (admitted *pro hac vice*)<br>125 Broad Street<br>New York, NY 10004<br>Telephone: (212) 558-4000<br>Facsimile: (212) 558-3588<br>Email:   wheelers@sullcrom.com<br>         gluecksteinb@sullcrom.com<br>         dunnec@sullcrom.com<br>         crokej@sullcrom.com<br><br>*Counsel for Plaintiffs* |